No. 44,558

DALE STEELE, *Appellee and Cross-Appellant,* v. J. I. CASE COM-
PANY and WESTERN IMPLEMENT CO., INC., *Appellants and Cross-
Appellees.*

(419 P. 2d 902)

Opinion filed November 5, 1966.

*Geo. V. Allen,* of Lawrence, argued the cause, and *Don C. Smith,* of Dodge City, was with him on the briefs for the appellants and cross-appellees.

*James A. Williams,* of Dodge City, argued the cause and was on the brief for the appellee and cross-appellant.

The opinion of the court was delivered by

FONTRON, J.: This is an action to recover damages to crops growing out of a breach of an express warranty given on three new Case combines. The action was tried to a jury which returned a verdict in favor of the plaintiff. Judgment was entered on the verdict and the defendants have appealed.

The plaintiff, Dale Steele, is a western Kansas farmer engaged in extensive farming operations, on his own and rented land, in Ford and Greeley counties, both in Kansas, and in Kiowa County, Colorado. For the year 1960 he expected to have some 4100 acres of wheat and 1100 acres of barley to be harvested. In this opinion, he will be referred to either as Steele or as plaintiff. The defendant, J. I. Case Company, is a corporation engaged in manufacturing, distributing and servicing farm machinery and equipment, including grain combines, while the defendant, Western Implement Company, Inc., is a wholly owned subsidiary of Case, engaged in marketing Case products. Collectively, they will be called Case, or defendants, or the company.

On November 3, 1959, the plaintiff bought two combines from Case to be delivered on or before June 1, 1960, and later, on June 9, 1960, he purchased a third Case combine from the company. These purchases were evidenced by written orders drawn up on printed forms furnished by Case and containing, on the back side, a printed warranty in which Case warranted its products (1) "to be well made of good material and to be durable with good care," and (2) "if properly set up, adjusted, and operated by competent persons, to be capable under ordinary conditions of doing the work for which it is designed."

The warranty contained certain exclusions and limitations which are important in this lawsuit and which should be pointed out at

this time. In Paragraph 2 (a) the warranty provides in substance that if any Case product, after being operated for two days, should fail to fulfill the warranty, written notice thereof should be given the dealer; that if the dealer did not remedy the defect, the company, upon receiving timely written notice, should be given reasonable time either to send a competent person to remedy the defect or suggest a remedy by letter; and if the product was found by the company to be defective in material or workmanship, the company would see to it that the defect was remedied, the purchaser agreeing to render necessary and friendly cooperation.

Paragraph 2 (b) of the warranty provides:

"If, after such notice and opportunity to remedy the difficulty, the Company fails to make the product fulfill the warranty, the part that fails shall be returned immediately by the purchaser, free of charge, to the place from whence it was received and the Company notified thereof at its Branch House aforesaid, whereupon the Company shall have the option to furnish another machine or implement or part in place of the one so returned which shall fulfill the warranty, or to cause to be returned the money and notes or proportionate part thereof received for such machine or implement or part and no further claim shall be made."

Paragraph 3 excludes other express, implied or statutory warranties, while Paragraph 5 of the warranty reads as follows:

"The Company's liability for any breach of this warranty is limited to the return of cash and/or notes actually received by it on account of the purchase price of said product or part."

The two machines purchased in November 1959 were delivered to plaintiff in Ford County about June 12, 1960, and harvest started about June 16. The third combine was delivered to Greeley County, where harvest commenced some ten or fourteen days later. From the beginning, the combines failed to operate properly, developing numerous and sundry mechanical defects, deficiencies and breakages, and losing a disproportionate amount of grain.

In response to repeated complaints lodged by the plaintiff, Case dispatched various employees and representatives to work on the machines in an effort to correct their defects and improve their performance. It would be entirely impractical, and we deem it wholly unnecessary, to relate in specific detail the many difficulties encountered by plaintiff in his operation of the machines, the frequent attempts by Case to repair the combines and make them work effectively, and the several conferences betwen Steele and Case concerning the problems which arose from the faulty machines.

It is sufficient to say, at this point, that the plaintiff became "fed up" with the many delays which resulted from the faulty performance of his new combines and with the inability of Case to remedy their imperfections; that Case, through its representatives, insisted throughout that the machines could be made to work and continued its efforts to prove the point while, at the same time, the company categorically refused Steele's several demands for a return of the purchase price; that plaintiff, on July 17, 1960, signed an order, accepted in writing by a Case representative, for three 1961 Case combines to be delivered on or before June 1, 1961, or as soon thereafter as possible, in payment for which Steele was to trade his three 1960 machines and pay a cash difference of $1,057.80, the order being subject to satisfactory demonstration in the wheat field of the present machines and 1961 models. This order was later superseded by an order of December 31, 1960, reducing the cash payment to $538.12, and the new machines were apparently delivered according to agreement.

It appears from the record that after this order had been signed new headers were placed on the 1960 machines and they were used with other combines until plaintiff's Greeley County crops were finally harvested about July 25, 1960, some ten or fourteen days later than normal. In the meantime, Steele's crops had been materially damaged by adverse weather conditions. The present action was therefore instituted to recover consequential damages resulting from delays due to the alleged breach of defendants' warranty.

At the trial, and in their answer, the defendants claimed that Steele's execution of the order for the new 1961 machines constituted an accord and satisfaction of all claims he might have for breach of warranty. This was sharply disputed by Steele, who contended the transaction settled only his claim for the purchase price of the combines, and there was evidence supporting this view. The conflicting evidence went to the jury which, under instructions not criticized, resolved the dispute in plaintiff's favor. When the appeal was argued, defense counsel conceded this issue of fact had been resolved adversely to his clients and was no longer subject to argument. Hence, accord and satisfaction is not now in the case.

In their brief, the defendants have condensed their statement of points into four general propositions:

1. That plaintiff was furnished three new combines in fulfillment of their warranty.

2. That this lawsuit is contrary to Paragraph 5 of the warranty on which plaintiff relies.

3. That the verdict resulted from passion and prejudice and is contrary to the evidence for the following reasons:

(*a*) It disregarded uncontroverted evidence that plaintiff failed to mitigate his damages.

(*b*) Plaintiff's own evidence showed his crops could not have been harvested by means contemplated by him prior to the storm of July 15, 1960.

4. That plaintiff failed to sustain the burden of proof and the jury was forced to rely on speculation and conjecture.

As to the first point, we understand Case to urge that the transaction between it and Steele, pursuant to which Steele was to receive three 1961 machines the following year in return for his old machines, plus $538.12 in cash, constituted an exercise by Case of the option it possessed under Paragraph 2 (*b*) either to furnish other machines in fulfillment of its warranty or to return the purchase price, and that the plaintiff was thereby barred from making any further claim.

This position, we believe, is untenable. The order itself, which was signed by plaintiff and accepted in writing by a Case representative, specifies a "cash purchase price" for the three machines, a "trade-in" allowance for Steele's three combines, and a "cash on delivery" payment of $538.12. The transaction is referred to by the parties as a "trade" and it bears all the earmarks of one.

Furthermore, we deem it significant that the new machines were not to be delivered until on or about *June 1, 1961,* or as soon thereafter as they could be furnished. Certainly a replacement in kind on *that* date was not contemplated by Mr. Steele when he purchased the combines for use in the 1960 harvest. His 1960 crops had to be harvested in 1960—not 1961. It is well known by those who live or do business on the High Plains that wheat must be cut when it matures, lest it fall victim to storms and other vagaries of nature which often cause havoc. Delays can, indeed, prove disastrous; stands of ripened grain can be ruined and farmers wiped out in a matter of minutes.

The provisions of Paragraph 2 (b), which gave Case an option, after failing to remedy defects, either to furnish other machines or to return the purchase money and which forbade further claims, are to be construed in the setting under which the machines were purchased. Case representatives who were involved in the sale of

the combines to Steele either were at the time or had been connected with the company dealership at Dodge City, in the heart of the wheat belt, and must have been fully as cognizant of the hazards of wheat farming, as was the plaintiff himself. The company, as well as Steele, knew the machines were to be used in the 1960 harvest and both parties must have been equally aware of the damage which might well be sustained by Steele if the combines proved defective and occasioned delays in the harvesting of his grain crops.

The seller of a piece of machinery would be wrong to suppose that he could fully fulfill a warranty, containing provisions similar to Paragraph 2 (b), by first taking an inordinately long time in an effort to remedy the defect and then, failing in his attempt, by furnishing a substitute machine a year after special damages had accrued. We believe such is not the law.

In *Allen v. Brown*, 181 Kan. 301, 310 P. 2d 923, this court was confronted by a somewhat comparable situation, and we there said:

"Where, as in this case, the express warranty contemplates that the seller's liability for a breach of warranty does not attach until he has had an opportunity to remedy the defects, his failure or refusal to act, where such opportunity is afforded the seller, fixes his liability. Under these circumstances the following is quoted from 77 C. J. S., Sales, § 340, p. 1235:

" '. . . An unsuccessful effort to remedy the defects renders the seller liable on his warranty; and the buyer is not bound to allow him a second opportunity, or to permit him to tinker with the article indefinitely in the hope that it may ultimately be made to comply with the warranty. . . .' " (p. 308.)

The *Allen* case was cited with approval and followed in *Rose v. Chrysler Motors Corp.*, 212 C. A. 2d 755, 28 Cal. Rptr. 185, 99 A. L. R. 2d 1411, where the California court had this to say:

"The vendor does not have an unlimited time for performance of its obligation to replace. (46 Am. Jur., Sales, § 732, p. 858; 77 C. J. S., Sales, § 340, p. 1235.) In a situation such as the one at bar where the buyer has repeatedly sought performance of the seller and failed to receive it, the promise of the latter is to be deemed broken and the prescribed measure of damages applied . . ." (p. 762.)

A decision of the Oklahoma Supreme Court in *Reitan v. Wilkinson*, 154 Okl. 163, 7 P. 2d 486, is illuminating. This was a case involving a breach of warranty on a Twin City tractor which provided that, in case of defects, the vendor be allowed a reasonable time to send a competent man to put the machine in good order, and that if the tractor could not be made to fulfill the warranty, the seller had

the option of furnishing another machine or refunding the purchase price, either of which should constitute a settlement in full and a release of all claims under the contract. These provisions, it is apparent, were very similar to those of the instant warranty. In its opinion, the court quoted from a passage in 24 R. C. L., at page 241, as follows:

" '. . . The right given the seller to replace defective parts or to substitute another article does not itself impose any active duty on the buyer to make a return to the seller; but a provision of this character does not require the buyer to give the seller an indefinite length of time within which to remedy the defect, and if, after reasonable time therefor is given the seller, the chattel still fails to conform to the warranty, the buyer may resort to his ordinary remedies.' " (p. 165.)

We now progress to the second point raised by Case, *i. e.*, that this action is contrary to the provisions of Paragraph 5 of the warranty. It has been plaintiff's stance, throughout these entire proceedings, that this clause, which purports to limit the seller's liability for breach of warranty to a return of the purchase price, is void as being contrary to public policy. This contention was urged before the trial court which ruled, as a matter of law, that the provision was not void as against public policy, but was not available as a defense under the particular facts of this case. In line with this ruling, the trial court instructed the jury to disregard Paragraph 5 and, also, to disregard the provisions of Paragraph 2 (b), the effect of which we have previously considered.

We deem the rule to be well settled in this jurisdiction, as well as in a majority of others, that in the absence of valid provisions limiting the extent of a vendor's liability upon its warranty, special or consequential damages may be recovered where they proximately result from a breach of warranty and may reasonably be regarded as having been within the contemplation of the contracting parties. (*McNaghten Loan Co. v. Sandifer*, 137 Kan. 353, 358, 20 P. 2d 523; *Challis v. Hartloff*, 136 Kan. 823, 18 P. 2d 199.)

The general rule in this regard is stated in 77 C. J. S., Sales, § 374 b, pp. 1318, 1319:

"Where there are special circumstances, the buyer is entitled to recover any special or consequential damages he has suffered, which are the natural and direct result of the breach of warranty, and which are the proximate result of the breach of warranty, and which may reasonably be considered as within the contemplation of the parties at the time of the contract as the result of a breach."

However, the question presented in *this* action is whether the limitation contained in Paragraph 5 precludes recovery of consequential damages of the character shown here, damages which, we hasten to add, we think must be within the contemplation of every person dealing in harvesting equipment who is familiar with the exacting demands of a Kansas harvest.

The defendants' posture that liability under their warranty is strictly limited to the purchase price paid for the combines rests on the premise that parties who are competent to contract are bound by the terms of their agreements which are freely and understandingly made. This legal maxim appears unassailable from a purely doctrinal standpoint.

Of recent years, however, a good deal has been written by legal savants pointing out the inequities which may result from a rigid enforcement of the disclaimer and limiting clauses which are so prevalent in commercial sales agreements. These scholars suggest that the efficacy of clauses of this character should be judged within the framework of modern business practices.

Today, there is often wide disparity in the bargaining positions of seller and purchaser. Writers have frequently called attention to the fact that a great many sales are transacted and concluded, as in this case, on the basis of standard printed forms whose terms are dictated by the seller, generally a large commercial concern, and in whose preparation the buyer has no voice. Agreements of this character, often called "adhesion contracts," are defined by Albert A. Ehrenzweig as:

". . . Agreements in which one party's participation consists in his mere 'adherence,' unwilling and often unknowing, to a document drafted unilaterally and insisted upon by what is usually a powerful enterprise. . . ."

See "Adhesion Contracts in the Conflict of Laws," 53 Colum. L. Rev. 1072, 1075.

The give and take which formerly existed in the market place between a seller and a comparatively equal buyer as the two arrived at the terms of a sale has often given way to a situation in which a powerful corporate seller, on the one hand, occupies a dominant position in dealing with a private individual buyer, on the other hand. In discussing the inequalities inherent in the economic difference between seller and buyer, and the injustices which may arise therefrom, the authors of an article entitled "Warranties of Kind and Quality," appearing in 57 Yale L. J. 1389 (1948), say:

". . . sellers have used their superior bargaining position to extricate themselves from their growing burden of warranty obligations. [23 Minn. L. Rev. 784-5 (1939)] The disorganized and dependent consumer has had little alternative but to acquiesce, in this one-sided legal disarmament." (p. 1400.)

We do not propose, within the confines of the present opinion, to explore this fascinating subject in great depth. It is ably and quite exhaustively treated in *Henningsen v. Bloomfield Motors, Inc.,* 32 N. J. 358, 161 A. 2d 69, the study of which we commend to the interested seeker after knowledge.

In the *Henningsen* case, suit was brought to recover for personal injuries received in an auto accident allegedly resulting from defects in a Plymouth car which had recently been purchased. The action was predicated on breach of implied warranty and the Chrysler Company defended on the ground that its liability was fixed by the terms of an express warranty which excluded all other warranties, express or implied, and which limited its responsibility to replacing defective parts sent to the factory within ninety days after the car was delivered. This defense was rejected in a well-formulated opinion in which the New Jersey Supreme Court noted the "grossly disproportionate bargaining power [of Chrysler] to relieve itself from liability," and to impose its choice on "the ordinary buyer, who . . . has no real freedom of choice." (p. 404.) The court directed attention to the fact that the warranty was a standardized form for mass use in the automobile industry and pointed out that the limitation was not shown to have been brought to the purchaser's notice.

In permitting recovery of consequential damages, consisting of personal injuries, the court, on page 404, concluded:

". . . In the framework of this case, illuminated as it is by the facts and the many decisions noted, we are of the opinion that Chrysler's attempted disclaimer of an implied warranty of merchantability and of the obligations arising therefrom is so inimical to the public good as to compel an adjudication of its invalidity . . ."

The *Henningsen* case was cited with approval and followed in principle in *State Farm Etc. Ins. Co. v. Anderson-Weber,* 252 Iowa 1289, 110 N. W. 2d 449. (See, also, *Rasmus v. A. O. Smith Corporation,* 158 F. Supp. 70.)

Although *Henningsen* may not be specifically in point, recovery being allowed on the basis of implied warranty whereas, in the instant case, the warranty is express, we believe the principle em-

braced therein is pertinent. We suggest, also, that the legal philosophy which lies at the heart of the New Jersey decision appears to be reflected in K. S. A. 84-2-719 (3) providing that "consequential damages may be limited or excluded [by agreement] *unless the limitation or exclusion is unconscionable.*" (Emphasis ours.) Although this statute, which forms part of the Uniform Commercial Code, was not enacted in Kansas until 1965 and, hence, can play no part in the disposition of this case, we mention it as evidencing a trend of modern thought in the area we are discussing.

We are of the opinion that the principles espoused in *Henningsen* are applicable to this case. In this case, there is disparity of position between the two contracting parties. In this case, the contract is on a printed form dictated by a corporate seller, Case, in the preparation of which the individual buyer, Steele, had no part. In this case, there is an entire absence of proof that the limitations on the company's liability, expressed in Paragraph 5, was ever called to the buyer's attention; indeed, the inference is entirely to the contrary, for Steele testified he had no conversations with Case representatives about the warranties and no part in formulating the same—he only knew that Case warranted its new machinery and bought in reliance thereon.

In this case, also, the seller knew the combines were purchased for use in the 1960 harvest and must be deemed to have known, through its representatives, the urgency of harvest on the High Plains and the dangers consequent upon any stoppage in operations after the grain has ripened and is ready to cut. And in this case, despite such knowledge, the seller wasted thirty crucial days in attempting to remedy defects and to get the machines working, refusing during this critical time either to replace the machines with others which would operate or to repay the purchase price, even though such was demanded.

Under the conditions outlined, we conclude that it would be unfair and inequitable to give effect to the provisions of limitation encompassed in Paragraph 5 of the warranty. In so deciding, we intend no blanket condemnation of limitations upon the liability of a warrantor nor do we mean to stigmatize provisions of limitation or exclusion as universally inimical to the public good. We hold, only, that within the framework of the facts shown to exist in this case, it would be unjust to enforce the limitation set out in Paragraph 5.

This holding we deem to be consistent with our decision in

*Allen v. Brown,* supra. In that case, the plaintiff had purchased a new Plymouth car warranted by the manufacturer to be free from defects in material and workmanship and limiting its obligation under the warranty to making good any part or parts disclosed to its satisfaction to be defective. The car turned out to be a "vibrator," and suit was filed against the dealer who sold the car and who had expressly adopted the manufacturer's warranty. Damages were sought in the amount of the purchase price and, in addition, for loss of use and loss of time.

The case came to this court on an order by the trial court overruling a demurrer to the plaintiff's petition. We sustained the lower court thus holding, in effect, that special damages were recoverable under the facts as pleaded. While the validity of the provision limiting the defendant's obligation under the warranty was not expressly discussed, the clear inference was left that the limiting clause would not preclude the buyer from recovering consequential damages. In our opinion, we said:

"The measure of damages for breach of warranty is the loss directly and naturally resulting from the breach of warranty. *In the absence of special circumstances showing proximate damage of a greater amount,* this is the difference between the value of the goods at the time of delivery and the value they would have had if they had conformed to the warranty. *It is thus clear that consequential damages, if properly pleaded and proved, may be recovered by reason of breach of warranty."* (p. 309) (Emphasis supplied.)

The two final points raised by the defendants pertain to damages and may be considered together. It is first urged that plaintiff failed to mitigate his damages and that recovery should be denied for this reason. The defendants concede that the jury was fairly instructed on the plaintiff's duty to minimize or mitigate his damage (See *Cain v. Grosshans & Petersen, Inc.,* 196 Kan. 497, 501, 502, 413 P. 2d 98), but argue that Steele failed to employ custom cutters to harvest his crops when the evidence showed they were on hand.

We think this defense is not available to the defendants. The evidence showed that during the time the machines were inoperative the defendants assured plaintiff they would remedy the defects, that the combines could be made to run, and that the company wanted a chance to prove its point. If plaintiff relied on these assurances, the defendants are in no position to complain. In *Winfrey v. Automobile Co.,* 113 Kan. 343, 214 Pac. 781, this court held:

"If an agreement has been technically broken and the defaulting party to

it makes promises from time to time that he will fulfill the agreement which leads the other party to believe that it will soon be fulfilled, the latter will not be barred from a recovery of damages although relying on the promises he may have taken no steps to prevent loss." (Syl. ¶ 3.)

This decision accords with the general rule which is expressed in 25 C. J. S., Damages, § 33, p. 704:

"Where the party primarily liable himself attempts or promises to take proper steps to reduce or prevent damages when the injury is impending or has actually begun, such fact may be considered in connection with the failure of plaintiff to perform the necessary act or to make the requisite effort to limit or avoid the loss."

Furthermore, after it became apparent that the defendants' efforts to make the combines work were not being crowned with unqualified success, custom combines were engaged by Steele to supplement the ailing Case machines, at a total cost to Steele of some $7,400, this being an item Steele had not bargained for at the time he made his purchases.

The duty to mitigate damages is not an unlimited one; an injured party is bound only to exert reasonable efforts to avoid damage; his duty is limited by the rules of common sense. (*Atkinson v. Kirkpatrick,* 90 Kan. 515, 135 Pac. 579; *Swisher v. Beckett,* 172 Kan. 711, 242 P. 2d 831; *In re Estate of Stannard,* 179 Kan. 394, 295 P. 2d 610; 25 C. J. S., Damages, § 33, pp. 702, 703.) We are unwilling to say, as a legal conclusion, that under the facts shown here the plaintiff failed to take reasonable precautions to avert or lessen his loss. The jury found to the contrary and we believe there was substantial evidence to warrant that determination.

The defendants insist, also, that plaintiff's evidence showed that even if the Case combines had been in perfect working order, Steele's harvest could not have been completed in time to avert the damage. Taken out of context, a few isolated answers of one of plaintiff's sons might be so construed. There is a wealth of other evidence, however, that Steele's harvest was substantially delayed because of the failure of the Case machines and that, otherwise, harvest would have been concluded in Greeley County prior to the July 15 storm which caused major damage. Whatever conflict existed in this regard was for the jury to reconcile and its finding is conclusive. (See cases, 1 Hatcher's Kansas Digest, Rev. Ed., Appeal and Error, § 496, p. 200.)

Finally, the defendants say that plaintiff failed to sustain his burden of proof and that the jury was left to engage in speculation

and conjecture. There is no rational basis for this contention. We shall not undertake any lengthy summarization of the voluminous evidence adduced at the trial of this action. It is necessary only to state there was substantial competent evidence to the effect that Steele's loss in wheat alone, on the nearly 1700 acres which were damaged, exceeded $40,000, while the loss to his barley crop, raised on some 400 acres, amounted to more than $5,000. In addition, Steele was put to an additional expense of $7,400 in hiring custom cutters. The verdict of $38,346 was substantially less than the total of these three amounts and was well within the range of the evidence.

Our conclusion that the defendants' appeal cannot be sustained makes it unnecessary for us to consider the cross-appeal filed by the plaintiff.

The judgment of the court below is affirmed.