Walter JOHNSON, Plaintiff
and Appellant,

v.

JOHN DEERE COMPANY and Nelson
Implement, Inc., Defendants
and Appellees.

No. 12930.

Supreme Court of South Dakota.

Argued Sept. 12, 1980.

Decided June 3, 1981.

Rehearing Denied July 6, 1981.

Wally Eklund of Johnson, Johnson & Eklund, Gregory, for plaintiff and appellant;
Robert J. Krueger, Jr., of Devany & Krueger, Vermillion, on brief.

Timothy J. Nimick of Woods, Fuller, Shultz & Smith, Sioux Falls, for defendant and appellee John Deere Co.

Gale E. Fisher, Sioux Falls, for defendant and appellee Nelson Implement, Inc.

MORGAN, Justice.

This action was commenced for recovery of damages sustained by appellant Walter Johnson, arising from alleged breach of warranty by appellees John Deere Company, the manufacturer, and Nelson Implement, Inc., the seller of a farm tractor. John Deere Company counterclaimed for a judgment on the balance due on an installment sales contract executed in consummation of the purchase and also counterclaimed for foreclosure on the machinery. The trial court granted appellees' motion for a directed verdict after appellant had rested in its civil proceeding before a jury. The trial court entered judgment accordingly. On its own motion, the trial court also entered judgment in favor of John Deere on its counterclaim. Appellant appealed. We reverse and remand.

After the Uniform Commercial Code (UCC) was adopted by our legislature as Chapter 150 of the 1966 Session Laws, it was incorporated into the Compiled Laws of 1967 as Chapter 57, but without any correlation between the statutory section numbers and the numbering of the official UCC text as approved by the National Conference of Commissioners on Uniform State Laws. In the 1980 revision of Volume 15, which included Title 57, the code commission transferred the sections in Title 57 to new Title 57A and renumbered the sections to correspond with the official text. For the purpose of clarity, in this opinion we cite the various statutory sections by their designation in the 1980 revision and cite the official UCC text and the official comments thereto by their designation in the official text, which may be correlated to the statutes by simply interposing 57A before the citation.

For further simplification, appellant Walter Johnson will be referred to as appellant, Johnson, or buyer, whichever is more appropriate in the context. John Deere Company and Nelson Implement, Inc. will be referred to as appellees collectively, or respectively as Deere or manufacturer and Nelson or seller, as fits the context in which they are used.

Prior to farming, appellant spent four years in military service where he was trained to be a diesel mechanic. Upon his discharge from the service he attended South Dakota State University in Brookings, South Dakota, where he received a degree in agricultural education in 1959. He then worked for Commercial Credit Equipment Corporation until 1965 when he began farming in the Alcester, South Dakota, and Hawarden, Iowa, area. He began doing custom combining in the fall of 1966. In 1975 he decided to purchase a John Deere 8630 tractor in order to improve his custom operations. His custom operation consisted primarily of grain combining, hay stacking and windrowing, small grain windrowing, and some tillage work.

Before deciding to purchase the new John Deere tractor, appellant talked with several farmers in the area in which he lived to find out if he would be able to do enough outside combining to justify the purchase of the new tractor, and it appeared that he would be able to do so. In addition to the John Deere 8630 tractor, appellant also purchased a chisel plow, a disc, and a subsoiler. The value of the equipment was $71,652, but with his trade-in, appellant owed Nelson $43,749.87. At the time of the purchase both Curtis Nelson, owner of Nelson, and one of his salesmen, Lyle Larson, knew that appellant was going to be using the tractor and attachments for custom work.

The purchase order, which appellant signed when he bought the John Deere 8630 tractor, contained at the bottom a warranty limitation which read:

The Warranty on the reverse side is a part of this contract. Neither seller, John Deere Company, nor the manufacturer makes any other representations or warranties, express or implied (AND EXPRESSLY DISCLAIMS THE IMPLIED WARRANTIES OF MERCHANTABILI-

TY AND FITNESS) or has any obligations to the Purchaser except as provided on the reverse side.

The New Equipment Warranty, printed on the back of the purchase order, first provided, in pertinent part: "Parts which are defective in materials or workmanship as delivered to the purchaser will be repaired or replaced[.]" Thereafter followed details as to maximum months and/or hours with respect to specific parts or components, none of which provisions are at issue here. A subsequent paragraph further provided:

G. REMEDIES EXCLUSIVE.

The only remedies the purchaser has in connection with the breach or performance of any warranty on John Deere equipment are those set forth above. In no event will the dealer, John Deere or any company affiliated with John Deere, be liable for incidental or consequential damages or injuries, including, but not limited to loss of crops, loss of profits, rental of substitute equipment or other commercial loss.

SDCL 57A–2–719(1)(a) provides that the parties' agreement may limit the buyer's remedies to "repair and replacement of nonconforming goods or parts[.]" SDCL 57A–2–719(1)(b) further provides that if that remedy is expressly agreed to be exclusive, it is the sole remedy. That intent must be clearly expressed. The New Equipment Warranty under consideration clearly expressed, by its terms, the intent that the purchaser's remedy was exclusively limited to repair or replacement of defective parts by the manufacturer.

We view the key issue to be whether, under the circumstances of this case, buyer is entitled to relief through the general remedies of the UCC under SDCL 57A–2–719(2), which provides:

Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title.

The first comment to the official text of the UCC states,

[I]t is of the very essence of the sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract. . . . [U]nder subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article.

The issue, as appellant framed it, is, "Will the law protect a purchaser who buys a lemon?" The term "lemon" is, of course, not to be found in the UCC; however, it has a well-recognized connotation.[1] The trial court used the term in ruling against appellant's offer of proof related to consequential damages when saying: "Now, you know the law won't protect you from a lemon, we know that. They will protect you from a breach of any warranty." At the close of appellant's case the trial court granted appellees' motion for directed verdict on appellant's complaint. In so doing, the trial court stated,

Well, I have a certain amount of empathy, needless to say, for the plaintiff in this case. But what it all boils down to is do our statutes mean what they say and, are they effective. And I think under the state of this record that there is no unreasonable delay. Of course there were delays, there is bound to be. But any unreasonable delays upon the part of John Deere or Nelson Implement. I think the gentleman, the plaintiff when he signed the contract understood what he was signing. He was experienced. And I cannot see anything in the state of the record that would get me into any of the exceptions to allow me to go to the jury. I think the motions are well taken.

---

1. Webster's Third New International Dictionary, p. 1293, defines "lemon" as "something or someone that proves to be unsatisfactory or undesirable: DUD, FAILURE . . . ."

I'm going to grant the motions as to both the defendants[.]

After reviewing the record, we are inclined to agree with the trial court's characterization of the tractor as a "lemon," but we disagree that the law will not protect the purchaser of a lemon. The catalog of appellant's problems with the tractor began shortly after it was put into full use. The tractor was delivered on November 10, 1975, and it was immediately put to use, accumulating about seventy-five hours on the hour meter by January 1, 1976. Appellant began using the tractor again in the spring of 1976. Shortly thereafter, trouble began with the front wheels, and it was discovered that the wrong size bolts had been used in the manufacture of the machine. Oil leaks, transmission problems, and internal engine problems developed throughout the 1976 farming season. Appellant called upon Nelson to repair the defects, and for the most part this was done, although there were some delays in securing parts.

In mid-February of 1977 appellant returned the tractor to Nelson for transmission repairs, and Nelson also made extensive factory-ordered modifications. Shortly after the tractor was returned to appellant, he experienced additional problems with water hoses, the transmission again, and the fuel-injection system. After appellant unsuccessfully attempted to have another John Deere dealer repair the fuel-injection system by replacement of the injectors, he returned it to Nelson for service. After another attempt to use the tractor, it again broke down, whereupon it was discovered that the shaft of the injector pump was broken. The tractor was in use from May 1, 1977, until that fall when the tractor had injector seal problems. Appellant claims that it was not serviceable for the balance of the fall and winter of 1977–78. In the spring of 1978 the transmission problems developed again, and appellant was able to operate the tractor only in third, fourth, or reverse gear. In June of 1978 appellant was notified to return the tractor to Nelson for extensive factory modifications, which

he did. At that point, the hour meter read over 1300 hours.

In ruling on the motions, the trial court apparently recognized that SDCL 57A–2–719(2) permits recovery even in the face of the warranty where the circumstances cause failure of the purpose of the warranty, otherwise he would have had no reason to discuss delays.

Appellant relies on *Ehlers v. Chrysler Motor Corporation*, 88 S.D. 612, 226 N.W.2d 157 (1975). That case, however, is at least distinguishable in that in *Ehlers*, the seller (Chrysler) had refused to repair or replace under the limited warranty.

Other courts, however, have in their respective jurisdictions examined the issue of failure of the warranty in the context that, although repairs were made or replacements furnished, because of the number of defects the warranty either failed or it did not. In one such case, *Clark v. International Harvester Co.*, 99 Idaho 326, 581 P.2d 784 (1978), the Supreme Court of Idaho examined the development of U.C.C. § 2–719(2) liability for damages.

In *Clark* the buyer of an International Harvester tractor had trouble attributed to bent or broken push rods in the engine, which resulted in eleven and one-half days loss-of-work time. The dealer made repairs, and later out-of-warranty defects cropped up. Addressing itself to the warranty, which by its terms limited the purchaser to the remedy of repairs and replacement of defective parts, the Idaho Court pointed out that, "The New Equipment Warranty did not state the time for performance of the repair or replacement obligation. Therefore, the defendants were obligated to repair or replace defective parts within a reasonable time pursuant to [SDCL 57A–2–309(1)]." *Id.* at 340, 581 P.2d at 798. South Dakota Codified Laws 57A–2–719(2) does not permit the seller to be dilatory or negligent in its contract in failing to repair or replace defective goods. Moreover, the Idaho Court stated, "[SDCL 57A–2–719(2)] is to apply whenever an exclusive remedy, which may have appeared fair and reasonable at the inception of the

contract, as a result of later circumstances operates to deprive a party of a substantial benefit of the bargain[,]" *Id., citing Beal v. General Motors Corporation*, 354 F.Supp. 423, 427, n. 2 (D.Del.1973), where the court held:

> The limited remedy fails of its purpose whenever the seller fails to repair the goods within a reasonable time; good faith attempts to repair might be relevant to the issue of what constitutes a reasonable time. However, since [57A–2–719(2)] operates whenever a party is deprived of his contractual remedy there is no need for a plaintiff to prove that failure to repair was willful or negligent.

In *Beal* the buyer had apparently purchased a GMC extra-heavy tonnage diesel truck-tractor which was warranted for repair or replacement of defective parts. The opinion is not specific as to the defects, but states that the buyer alleged "a host of defects" and that General Motors was unable or unwilling to repair or replace the offending parts *in such a way as to make the vehicle operable.*

> "An unsuccessful effort to remedy the defects renders the seller liable on his warranty; and the buyer is not bound to allow him a second opportunity, or to permit him to tinker with the article indefinitely in the hope that it may ultimately be made to comply with the warranty."
>
> . . . .
>
> "The vendor does not have an unlimited time for performance of its obligation to replace . . . ."

*Steele v. J. I. Case Company*, 197 Kan. 554, 559, 419 P.2d 902, 907 (1966).

In our opinion, this is the crucial question that separates the ordinary repair and replacement situation from the "lemon." It is a question of fact.

In *Myers v. Quenzer*, 79 S.D. 248, 254, 110 N.W.2d 840, 843 (1961) (citations omitted), this court said,

> When faced with a motion to direct, the trial court is not free to weigh the evidence or gauge the credibility of the witnesses. These are matters for the jury. He must accept that evidence which is most favorable to the party against whom the motion is sought, and indulge all legitimate inferences in his favor that can fairly be drawn therefrom. If, when so viewed, there is any substantial evidence to sustain the cause of action or defense it must be submitted to the jury. This is also the view we must take of the evidence when trial court determinations of this kind are challenged on appeal.

Our review of the record discloses that by granting the motion for directed verdict and thereby removing the resolution of the "lemon" issue from the jury, the trial court erred in violating the basic tenet that on such a motion it should view the evidence and every reasonable inference in a light most favorable to the nonmoving party.

The trial court was not only ignoring a good deal of direct evidence of numerous and prolonged delays, but also reasonable inferences arising from such evidence when it stated, "I think under the state of this record that there is no unreasonable delay. Of course there were delays, there is bound to be. But any unreasonable delays upon the part of John Deere or Nelson Implement." The last sentence, as reproduced in the transcript, is an enigma. If one reads "any" as "no" or if one reads it to end with a question mark instead of a period, either way it deals with a question of fact and a crucial one at that. The trial court decided a question that should have been submitted to the jury, and we therefore reverse and remand the case for a new trial.

Anticipating that on retrial the question of damages, particularly consequential damages, will recur, in the interests of justice and judicial economy we next consider the nature and extent of damages that are recoverable if the jury finds in buyer's favor on the issue of failure of essential purposes of the warranty to repair or replace.

Assuming *arguendo*, that buyer is able to establish that seller is liable for damages under the UCC, damage provisions are applicable to buyer. In his complaint, buyer

alleges general damages for breach of warranty for the $41,000 difference in value, at the time and place of acceptance, between the value of the goods as accepted and the value they would have had if they had been as warranted. He further alleges damages for expenses incurred in attempting to remedy the defects; loss of use of the tractor for his own farming purposes and for purposes of custom operation of some 3700 hours at a net value of $35 per hour, for a total of $129,500; and damages to his farming operation, business reputation, and general character in the community in the amount of $25,000.

As we have noted, SDCL 57A–2–719(2) provides that where the remedy afforded in the contract fails of its essential purpose, remedy may be had as provided in SDCL Title 57A. Comment number 1 to the official U.C.C. 2–719(2) text states that, "[U]nder subsection (2), where an apparently fair and reasonable clause because of circumstances fails of its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article."

With respect to buyer's remedies, we look first to SDCL 57A–2–714(2), which provides that a buyer's damage for breach in regard to accepted goods is as follows:

The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

SDCL 57A–2–714(3) then goes on to provide that, "In a proper case any incidental and consequential damages under [§ 57A–2–715] may also be recovered." Johnson properly sought to recover these damages.

SDCL 57A–2–715(2)(a) provides that,

Consequential damages resulting from the seller's breach include [a]ny loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise[.]

Comment 3 to the official text on this section, however, points out that any seller who does not wish to take the risk of consequential damages has available the section on contractual limitation of remedy. Paragraph G, as previously quoted, clearly excludes liability for consequential damages. Title 57A of South Dakota Codified Laws section 2–719(3), however, makes this provision for limitation on exclusion of consequential damages subject to the test of unconscionability.

"Unconscionability" is not susceptible of description. "It is not a concept, but a determination to be made in light of a variety of factors not unifiable into a formula." White & Summers, Uniform Commercial Code § 4–3, at 151 (2d ed. 1980) (emphasis in original). Under SDCL 57A–2–302(1) the issue of unconscionability is to be determined by the trial court.[2] Furthermore, it would appear that the contract or clause must be unconscionable at the time of contracting. We should note, however, that in the case of Industralease Automated & Scientific Eq. Corp., Etc., 58 A.D.2d 482, 490, 396 N.Y.S.2d 427, 432 (1977), the court held that when courts find unconscionability because a remedy has failed of its essential purposes, judges "cannot divorce entirely the events which occur later." U.C.C. § 2–302(2)[3] permits the parties to introduce evidence as to the commercial setting, pur-

2. SDCL 57A–2–302(1) provides:

If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

3. SDCL 57A–2–302(2) provides:

When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

pose, and effect of the limiting provisions so as to aid the court in its determination.

Professor Arthur Allen Leff, in a paper on U.C.C. § 2–302, traced the history of the development of the unconscionability clause. Leff, Unconscionability and The Code—The Emperor's New Clause, 115 U.Pa.L.Rev. 485 (1967). He first distinguished between procedural unconscionability and substantive unconscionability. The former deals with the process of making the contract, including a meaningful choice. *White & Summers* suggests that it proximates the common law of fraud and duress. The latter category deals with the overly harsh or one-sided terms. *White & Summers* compares this with the common-law clauses held contrary to public policy. Professor Leff points out that subsection (2) is a procedural section, but he applauds the addition as sound. "If judges were to be given the power to regulate the agreements within industries on an *ad hoc* basis, then, ... it would be useful if they were given the opportunity to learn, if only on an *ad hoc* basis, a little something about the industries they were regulating." Leff, *supra* at 543. He further stated, "And to this extent section 2–302(2) serves an important purpose: it makes possible the resuscitation of a provision which, though to the uninitiated might appear unreasonable, has a particular, reasonable job to do in a particular industry." *Id.*

The text writers indicate that the bulk of successful cases under U.C.C. § 2–302 deal with the unprotected and unsuspecting consumers in the market for consumer goods, often the victims of sharp practices: the over-priced stereos, the unreasonably favorable security devices, the illiterate buyer, and the fine-printed clauses. "[C]ourts have not been solicitous of business men in the name of unconscionability. In the last decade, however, a few courts may have found mere procedural unconscionability determinative, even in commercial settings." White & Summers, *supra* at 170.

Appellees argue strenuously that the contract between Johnson and Deere and Nelson is in a commercial setting that precludes consequential damages. They urge that appellant was not an ordinary consumer, but rather a knowledgeable buyer by reason of his military service training as a diesel mechanic, his college training and experience in agriculture, and his business acumen from his experience as a credit man for Commercial Credit Equipment Corporation, and they further point out that he negotiated the contract with particular interest in learning what warranties he did receive.

*Clark, supra,* 581 P.2d at 800, suggests that,

> The majority of the courts in cases involving the failure of an exclusive remedy contained in a warranty provision which also excludes liability for consequential damages have ruled that the provisions limiting liability fail also and that the plaintiffs are entitled to the full array of remedies provided by the UCC, including the recovery of consequential and incidental damages.

This reasoning is illustrated by the memorandum opinion of the trial court in *Jones & McKnight Corp. v. Birdsboro Corporation,* 320 F.Supp. 39, 43–44 (N.D.Ill.1970), wherein it reasoned,

> It is the specific breach of the warranty to repair that plaintiff alleges caused the bulk of its damages. This court would be in an untenable position if it allowed the defendant to shelter itself behind one segment of the warranty when it has allegedly repudiated and ignored its very limited obligations under another segment of the same warranty, which alleged repudiation has caused the very need for relief which the defendant is attempting to avoid.

■ The problem with that reasoning is that one may be comparing apples to oranges, inasmuch as the determination as to failure of the warranty to fulfill its purpose is based on entirely different criteria than the determination of the unconscionability of the remedy limitation. The determination of the former, where there is any evidence to support the claim, is a question of fact for the jury; while the

determination of the latter, by provision of the code, is a question for the trial court. Failure of the warranty to fulfill its purpose is necessarily determined by circumstances occurring after the contract is made, whereas unconscionability is to be determined as of the making of the contract. As we have previously noted, the courts are much more inclined to sustain the U.C.C. § 2–302 attack in the case of the downtrodden consumer than they are in the case of the commercial consumer who presumably has a far more meaningful choice.

In *Ehlers v. Chrysler Motor Corp., supra,* this court adopted the reasoning of the *Jones & McKnight Corporation* trial court quoted above. However, it is at best dicta, inasmuch as the *Ehlers* judgment was rendered on the basis of the difference in value of the vehicle as delivered and the value it would have had if the warranty had been complied with. This is clearly not consequential damages. Under the circumstances of *Ehlers* the decision is further distinguishable, inasmuch as the buyer was a consumer purchasing consumer goods, to-wit: an automobile; whereas in the instant case, the tractor is not a consumer good as defined under the code; rather, it is classified as equipment.[4] *See Am. Elec. Power Co. v. Westinghouse Elec. Corp.,* 418 F.Supp. 435 (S.D.N.Y.1976).

The record clearly supports appellees' argument as to buyer's background, experience, and business acumen. More importantly, it supports their assertion that buyer had examined the New Equipment Warranty and was fully aware and willing to trade off the remedy for consequential loss for the warranty of replacement and repair. At trial appellant testified that when he purchased the tractor he realized that under the warranty, repairs would be made for most things within a given period of time, but that he was more interested in the service that he would receive once he had purchased the tractor. Thus, although the repair and replacement warranty may

have subsequently failed of its essential purpose, thereby entitling him to general damages for breach of contract as outlined in the code, the limitation on remedy was not unconscionable at the time the contract was made, either procedurally or substantively, and he would not be entitled to recover consequential damages.

We finally come to the question of the counterclaim. As previously noted, in chambers at the close of appellant's case the trial court, in addition to granting the motion for directed verdict on the complaint, more or less gratuitously granted judgment on the counterclaim. "I think under the state of the record I can grant the defendant [Deere] the relief prayed for in the counterclaim because your client [Johnson] freely and openly admitted he was in default of the contract." The court then went on to state, "But I would go this far, I would give a stay of execution upon that relief upon the bond that has already been posted on a prior hearing in this matter if you determine you want to appeal this matter, counsel. Because I feel you have a legitimate matter of appeal."

The credit man for Deere was then called into chambers for the purpose of ascertaining the current balance due on the installment contract. Counsel for appellant did not object to the procedure, although he did refuse the court's suggestion that he stipulate to the amount due. He also cross-examined the witness after he was sworn and had testified on direct examination.

The form of judgment as entered provided in essence:

(1) That Johnson take nothing by his complaint and that this action against Deere and Nelson be dismissed upon its merits;

(2) That Deere recover against Johnson the sum of $47,616.88 which is secured by a security interest in the tractor and equipment; and

(3) That the tractor and equipment be sold as provided by law.

---

4. SDCL 57A–9–109(2) classifies goods as " '[e]quipment' if they are used or bought for use primarily in business (including farming or a profession) ...." This classification is applied to Title 57A by SDCL 57A–2–103(3).

Appellant filed his appeal from the entire judgment. His brief on appeal mentions the judgment on the counterclaim in the procedural history portion and the statement of fact, but nowhere else is, and specifically at appellate oral argument was, the judgment on the counterclaim ever mentioned.

During appellate oral argument, appellant's counsel advanced the argument that appellant was not in default on the installment contract, having been excused from performance by appellees' breach of warranty. This was the first time that counsel advanced this theory. He did not argue it before the trial court. In fact, he made no protestation when the trial court stated, "Your client freely and openly admitted he was in default on the contract."

▇▇ Furthermore, nowhere in his brief does appellant suggest this theory, nor for that matter does he even argue that the trial court was in error in granting the judgment on the counterclaim. "[W]e will not review a matter on appeal unless proper objection was made before the trial court." *Till v. Bennett*, 281 N.W.2d 276, 278 (S.D. 1979); *Stark v. Stark*, 79 S.D. 178, 109 N.W.2d 904 (1961). Objections must be made to the trial court to allow it to correct its mistakes. Moreover, an objection not properly raised, briefed, or argued on appeal is deemed abandoned, and we, the reviewing court, will not consider it. *In Re Rosengren's Estate*, 66 S.D. 138, 279 N.W. 540 (1938); *See also Shaffer v. Honeywell, Inc.*, 249 N.W.2d 251 (S.D.1976). We therefore hold that the judgment in favor of Deere on the counterclaim is not properly before us.

In summation, we hold that the trial court erred in removing from the jury's consideration the fact question of failure of the limited remedies; that it did, however, rule on the question of unconscionability and that we do not find its ruling to be clearly erroneous; and that the issue of the counterclaim in favor of Deere was not preserved for argument on the appeal, nor was it raised on appeal.

Accordingly, we remand the case for a new trial on the issue of failure of a limited remedy under SDCL 57A–2–719(2), and for determination of such damages, if any, allowable in conformity with this opinion.

DUNN, HENDERSON and FOSHEIM, JJ., concur.

WOLLMAN, C. J., concurs in part and dissents in part.

WOLLMAN, Chief Justice (concurring in part and dissenting in part).

Although the term "lemon" is colorfully descriptive, it is of little assistance in determining whether the tractor was so defective that there was a jury question on the issue whether the exclusive remedy contained in paragraph G of the purchase order failed of its essential purpose. After distilling plaintiff's testimony (at least fifty percent of which could be characterized as a Joycean stream of consciousness) to its essential facts, I conclude that the trial court correctly analyzed the factual situation in ruling on appellees' motion for directed verdict. As one who spent a good portion of his youth imprecating the manufacturers of farm equipment, I share with the trial court a feeling of sympathy for appellant. On the other hand, I am satisfied from the record that as a matter of law appellees fulfilled their obligations under the terms of the sales contract. It is clear from the service bulletins included in the record that John Deere experienced a number of component failures in the early units of this particular tractor series. It advised its dealers accordingly and supplied the dealers with the necessary replacement parts. Likewise, I find no evidence in the record that Nelson Implement was not reasonably prompt in repairing the tractor when notified of a particular defect or malfunction. When viewed in the aggregate, the problems that appellant experienced with the tractor might seem to paint a picture of a totally unusable piece of equipment. When examined singly and in the perspective of the sequence in which they occurred and were repaired, however, these defects are more properly viewed as a series of exas-

perating but understandable problems. Accordingly, I would affirm the trial court's ruling that the exclusive remedy did not fail of its essential purpose.

I agree with the majority opinion's treatment of the consequential damages issue and the counterclaim.