MIDLAND SUPPLY COMPANY, INC., Plaintiff and Counterdefendant-Appellee, *v.* EHRET PLUMBING & HEATING COMPANY, Defendant and Counterplaintiff-Appellant.

Fifth District   No. 81—446

Opinion filed August 5, 1982.

Pessin, Baird & Wells, of Belleville (Stuart I. Pessin, of counsel), for appellant.

Bruce S. Vick, of Belleville, for appellee.

PRESIDING JUSTICE KARNS delivered the opinion of the court:

Plaintiff, Midland Supply Company, Inc., brought an action in the circuit court of St. Clair County against defendant, Ehret Plumbing & Heating Co., Inc., seeking to recover the balance due on a contract for the sale of a boiler. Defendant denied liability and filed an amended counterclaim for damages sustained as a result of plaintiff's breach of warranties arising from the sale of two other boilers. After a bench trial, the court entered judgment in favor of plaintiff on the complaint in the amount of $3,304.95 and in favor of plaintiff on defendant's counterclaim. Defendant appeals.

The following issues are raised on appeal: (1) whether there were implied warranties of merchantability and fitness for a particular purpose arising from the sale of the boilers; (2) whether the evidence established that such warranties were breached because of the initial defects in the boilers; (3) whether defendant's labor costs were an element of damages if the warranties were breached; and (4) whether defendant proved that the subsequent failure of one of the boilers was caused by some defect of that boiler.

Plaintiff is a wholesale distributor of heating and plumbing supplies. Among the products that plaintiff sells are boilers manufactured by Weil-McLain, Inc. Defendant is a heating and plumbing contractor. In September 1975, defendant orally ordered from plaintiff a large boiler and a small boiler manufactured by Weil-McLain, Inc. The boilers were to be installed in the church and rectory, respectively, at St. Peter & Paul Church located in Waterloo, Illinois. On October 1, 1975, the boilers were delivered to the jobsite and, thereafter, paid for by defendant.

No disclaimers or limitations of warranties were discussed by the parties at the time defendant ordered the boilers. Witnesses for plaintiff testified that a manufacturer's warranty card along with an instructions manual were delivered to defendant in the crates that contained the boilers. Plaintiff was not aware of these warranty terms. The manufacturer's warranty card contained an express warranty that guaranteed for a period of one year after installation any parts found to be defective in manufacture. It also contained a limitation of remedies provision which excluded claims for labor in replacing defective parts and other claims for consequential damages. Finally, the disclaimer of warranties provision provided the following:

"THIS WARRANTY IS IN LIEU AND INSTEAD OF ANY OTHER WARRANTY, EXPRESSED OR IMPLIED, AND EXCEPT AS ABOVE PROVIDED, THERE ARE NO

WARRANTIES OF FITNESS OR MERCHANTABILITY."

In November 1975, defendant installed the small boiler in the rectory and then tested it to determine whether it was in working order. Defendant discovered that the boiler would not hold water because of a hole in one section. Defendant then contacted plaintiff who supplied replacement sections for the boiler without charge. In January 1976, plaintiff again supplied replacement sections for-the small boiler. Grant Ehret, defendant's president, testified that John Jay McKinney, president of plaintiff corporation, told him that it would reimburse defendant for the labor costs incurred in replacing the sections. McKinney denied that he made such a statement. The total labor cost in repairing the small boiler was $792; this sum was not paid by plaintiff.

In the fall of 1976, defendant installed the large boiler in the church and tested it to determine whether it functioned properly. Defendant found that two or three sections were leaking and contacted plaintiff to obtain replacements. Ehret testified that the replacement parts were sent by plaintiff without charge and that McKinney again stated that his company would pay for labor. Ehret testified that the labor cost was $1,302.72; this amount was not paid by plaintiff.

In November 1977, the large boiler failed and defendant immediately notified plaintiff. That day, plaintiff delivered an identical boiler to defendant. Thereafter, plaintiff billed defendant for $3,340.95, the purchase price of the replacement boiler, which defendant refused to pay. The labor cost incurred by defendant in replacing the boiler was $3,505.86.

At trial, conflicting evidence was presented as to the cause of the boiler's failure. Ehret testified that it had modified the boiler in that it changed the terminal connections on the low-water cutoff by installing a relay on the side of the boiler. Ehret further testified that the gas valve was defective in that it was stuck in an open position and that the low-water cutoff failed to supply water to the boiler. According to Ehret, the constant supply of heat coupled with the lack of water caused the boiler to overheat and crack. He further stated that the modification was unrelated to the failure and that the same modification was performed on the replacement boiler currently in operation. In his opinion, the defective gas valve was the main cause of the failure.

Thomas Behrmann, owner of R. A. Behrmann & Associates, a manufacturer representative for Weil-McLain, Inc., testified that he examined the large boiler on November 14, 1977. Behrmann testified

that although the gas valve stuck, the boiler should not have overheated because other parts of the system should have continued to supply water to the boiler. In Behrmann's opinion, the boiler failed because the relay between the low-water cutoff on the boiler and the pump on the boiler feed unit failed to operate. He further stated that this control was not in accordance with the instructions manual supplied by the manufacturer. Behrmann testified that his company charged plaintiff for the replacement boiler because the failure occurred beyond the warranted time period and was not caused by a manufacture defect.

On appeal, defendant argues that the sale of the two boilers gave rise to implied warranties of merchantability and fitness for a particular purpose under the Uniform Commercial Code. Further, defendant contends that these warranties were not disclaimed by the manufacturer's warranty provisions because the provisions were not submitted to defendant until the delivery of the boilers, and, therefore, were not a part of the sales contract.

At the outset, we note that, there is a distinction between an implied warranty of merchantability and an implied warranty of fitness for a particular purpose and conclude that defendant failed to prove that the latter arose from the parties' conduct.

■ Section 2—315 of the Uniform Commercial Code provides that where a seller knows of the particular purpose for which goods are required and the buyer relies on the seller's skill or judgment in selecting the goods, an implied warranty that the goods are fit for such a purpose arises. (Ill. Rev. Stat. 1979, ch. 26, par. 2—315; *Siemen v. Alden* (1975), 34 Ill. App. 3d 961, 341 N.E.2d 713.) In this case, plaintiff knew at the time of contracting that defendant purchased the boilers to be installed as the heating systems for the church and rectory. Defendant did not prove, however, that it relied on the skill and judgment of plaintiff in purchasing the boilers. Defendant told plaintiff that it wanted two gas-fired boilers, one for water and one for steam. It also gave plaintiff the technical specifications which included the radiation of the buildings and the size of the boilers then in operation. Plaintiff related to defendant the various sizes and prices of the boilers that it sold. The record supports the inference that defendant, an experienced heating and plumbing contractor, knew the type of boiler it planned to purchase and merely inquired as to the various sizes and prices. Therefore, we conclude that defendant failed to prove that the parties' dealings gave rise to an implied warranty of fitness for a particular purpose.

■ Section 2—314 of the Uniform Commercial Code creates an

implied warranty of merchantability in every contract for the sale of goods where the seller is a merchant engaged in selling such goods, unless the warranty is excluded or modified. (Ill. Rev. Stat. 1979, ch. 26, pars. 2—314, 2—316; *Burrus v. Itek Corp.* (1977), 46 Ill. App. 3d 350, 360 N.E.2d 1168.) The parties do not dispute that a contract for the sale of goods was entered into and that plaintiff was a merchant engaged in the sale of boilers, the subject matter of the contract. The issue, then, becomes whether the warranty was disclaimed by the manufacturer's warranty provisions. We find that *Gideon Service Division v. Dunham-Bush, Inc.* (1980), 80 Ill. App. 3d 633, 400 N.E.2d 89, is controlling, and, therefore, conclude that the implied warranty of merchantability was not disclaimed by the manufacturer's warranty provisions.

In *Gideon Service Division*, the plaintiff, a heating systems repair company, filed an action to recover damages resulting from a breach of an implied warranty for merchantability of a furnace component purchased from defendant, a manufacturer and seller of furnaces. The complaint alleged that plaintiff orally ordered a furnace unit from defendant and later installed the unit at a customer's business. It further alleged that despite several repairs, the unit failed to function properly. The trial court granted defendant's motion to dismiss the complaint based on its express disclaimer of the warranty. The warranty disclaimer was written on the reverse side of a sales order allegedly sent to plaintiff about one month after the order was placed. On appeal, the court reversed the trial court's judgment and held that defendant's motion to dismiss was not sufficient to establish that defendant timely disclaimed the warranty. The court noted that there was no assertion that any disclaimer was made at the time plaintiff ordered the furnaces, the written disclaimer materially altered plaintiff's understanding of the contract and there was no indication that plaintiff knew of or assented to the terms of the disclaimer. The court concluded that defendant's attempt to disclaim the implied warranty by means of the sales order submitted at the time the goods were delivered was insufficient.

As in *Gideon Service Division*, the manufacturer's warranty provision here was submitted to defendant at the time the boilers were delivered. In addition, no similar disclaimers were made by plaintiff at the time defendant ordered the boiler. The plaintiff is relying on the manufacturer's disclaimer of warranty, not its own, which may only be effective between itself, as a buyer, and the manufacturer as seller. (*Nagle v. General Merchandising Corp.* (1978), 58 Ill. App. 3d 344, 374 N.E.2d 1137.) Defendant was unaware of the terms

of the disclaimer at that time. Clearly, defendant cannot be said to have assented to the warranty terms which materially altered the sales contract. We conclude that the implied warranty of merchantability was not waived by the manufacturer's disclaimer.

The next issue is whether defendant proved that the implied warranty was breached because of the initial defects in the boilers.

■ Section 2—314(2)(c) of the Uniform Commercial Code provides, in pertinent part, the following:

"(2) Goods to be merchantable must be at least such as

\* \* \*

(c) are fit for the ordinary purposes for which such goods are used; \*\*\*." (Ill. Rev. Stat. 1979, ch. 26, par. 2—314.)

Defendant purchased the boilers for the purpose of operating as the heating systems in the church and rectory. It was undisputed that both the small and large boilers were defective and failed to function properly in that several sections of the boilers leaked and had to be replaced. Therefore, we conclude that defendant proved that the warranty was breached as regards the initial defects in the boilers.

■ Section 2—714(2) of the Uniform Commercial Code provides that the first element of damages recoverable by the buyer is the difference between the value of the goods accepted and the value they would have had as warranted. (Ill. Rev. Stat. 1979, ch. 26, par. 2—714(2).) It has been recognized that the practical measure of damages in determining the difference between actual value and warranted value is the cost to repair the goods to the quality warranted. (*Griese v. Cory Pools, Ltd.* (1978), 58 Ill. App. 3d 256, 373 N.E.2d 1383.) In addition, section 1—106 of the Uniform Commercial Code states that the remedies provided to the aggrieved party shall be liberally administered in order to restore that party to as good a position as if the other party had fully performed. (Ill. Rev. Stat. 1979, ch. 26, par. 1—106.) Therefore, we find that the labor costs incurred by defendant in installing the replacement parts because of the defective boiler sections are properly included as an element of damages.

■ ■ The final issue raised on appeal is whether defendant proved that the subsequent failure of the large boiler was caused by a defect in manufacture. It is established that whether an implied warranty has been breached is a question of fact, and such determination will not be set aside on review unless it is against the manifest weight of the evidence. It was undisputed that the gas valve was stuck in an open position and that the boiler failed in that it overheated and cracked. The parties did dispute what caused the boiler to overheat.

Defendant stated that the boiler overheated because of the defective gas valve. Plaintiff presented testimony that regardless of the condition of the gas valve the boiler would not have overheated if it had been supplied continuously with water. The reason that water was not supplied, according to plaintiff, was because of the faulty relay that connected the low-water cutoff to the boiler feed unit. This relay was a modification of the boiler and contrary to the recommendations of the manufacturer. Viewing the evidence as a whole, and considering that under the Uniform Commercial Code (Ill. Rev. Stat. 1979, ch. 26, par. 2—607(4)) the burden is on the buyer to establish any breach of warranty with respect to the goods, we cannot conclude that the finding that the failure of the large boiler was not a breach of warranty, implicit in the judgment of the trial court, was against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed in part, reversed in part and remanded.

Affirmed in part; reversed in part; remanded.

KASSERMAN and HARRISON, JJ., concur.