## L & L TRADING COMPANY, INC.
### v.
## TENNECO OIL COMPANY.

### Civ. A. Nos. 86–2084, 87–5833.

United States District Court,
E.D. Louisiana.

Aug. 1, 1988.

---

Phelps, Dunbar, Marks, Claverie & Sims, John P. Manard, Jr., Trial Atty., Robert B. McNeal, Harry Rosenberg, Russell Holwadel, New Orleans, La., for L & L Trading Co., Inc.

Deutsch, Kerrigan & Stiles, Charles K. Reasonover, Trial Atty., New Orleans, La., for Tenneco Oil Co.

## FINDINGS and CONCLUSIONS

LIVAUDAIS, District Judge.

This matter arises out of an agreement to purchase crude slop oil and No. 6 fuel oil. Plaintiff–Purchaser, L & L Trading Co., Inc. ("L & L"), is a corporation organized under the laws of Florida with its principal place of business in Destin, Florida. Defendant–Vendor, Tenneco Oil Co. ("Tenneco"), is a corporation organized under the laws of the state of Delaware with its principal place of business in Houston, Texas. This court has jurisdiction of this proceeding based upon diversity of citizenship, the matter in controversy exceeding the sum of $10,000.00 exclusive of interest and costs. 28 U.S.C. § 1332.

Plaintiff asserts a claim for compensatory and punitive damages on the basis of a number of theories: breach of contract, breach of implied warranty of merchantability, breach of express warranty, negligent and intentional misrepresentation, negligent failure to warn, and intentional and malicious conversion.

## FINDINGS OF FACT

At the trial of this matter to the bench, the following facts were adduced:

In November of 1985, Tenneco entered into a contract with K & L Petroleum, Inc. ("K & L"), through K & L's president Mr. Joe Luca, whereby K & L would act as Tenneco's sales agent. In November of 1985, Tenneco entered into a processing agreement with Falcon Refinery Company ("Falcon") for the refining of approximately 100,000 barrels of crude feedstock which Tenneco had purchased from Global Petroleum Company. Falcon agreed to refine the crude feedstock in return for a processing fee. In early December of 1985, Falcon commenced processing of the crude feedstock. However, Falcon experienced substantial problems in attempting to refine the feedstock. It would not run through the refinery unit as it contained a high volume of solids and sludge which constantly clogged the refinery unit and refinery pumps. This product emitted a noxious odor uncommon to ordinary oil products,

which alerted Falcon and Tenneco to its problematic nature. Approximately 15,000 barrels of the crude feedstock could not be refined and was referred to as "contaminated" by Falcon and Tenneco personnel on several occasions. Falcon stored this material in tanks 12, 20 and 24. Ms. Susan Bogan, a Tenneco sales representative, instructed Falcon to combine all of this material into tank 12. However, it was not until March 4 through March 7, 1986, that the majority of the material in tanks 20 and 24 were transferred into tank 12.

In February of 1986, Falcon repeatedly warned Tenneco in written and verbal communications that the "contaminated" feedstock could not be run through the refining unit, and had caused substantial damage to Falcon's equipment. Falcon also warned Tenneco that Falcon had obtained bids for disposal of the "contaminated material". According to one bid, it would cost more than $65.00 per barrel to dispose of the product. At the same time, Falcon commenced billing Tenneco for storing these substances in Falcon's tanks. Falcon demanded that Tenneco pay for the damage the material had caused to Falcon equipment, and advised Tenneco that it would not release Tenneco's product until Tenneco paid Falcon for the damage.

Having already sustained a significant loss under the processing agreement, and hoping to avoid additional storage and disposal costs for the material and other Tenneco products remaining at the refinery, Tenneco's sales representative, Ms. Bogan, and Tenneco's sales agent, K & L Petroleum, through Mr. Luca, solicited buyers for the material in question.

Mr. Walter E. Blessey, President of L & L Trading Company, Inc., was contacted by Tenneco's sales agent, Mr. Joe Luca of K & L Petroleum, with respect to purchasing a small quantity of residual fuel oil remaining in tank 26 at the Falcon Refinery. However, Ms. Bogan conditioned the sale of the residual fuel oil in tank 26 upon the purchase of the material remaining in tank 12.

Although defendant alleges that Mr. Luca's sales authority had been revoked

prior to these negotiations, this Court finds that Mr. Blessey was at no time advised that Tenneco had revoked Mr. Luca's sales agency authority. On the contrary, both Tenneco's and Mr. Luca's conduct evidenced that Mr. Luca remained Tenneco's sales agent throughout the negotiations with Mr. Blessey.

Mr. Luca represented that the material in tank 12 was crude slop oil, consisting of normal crude oil, naptha and water, that it had been extensively tested and was of commercial value, and that it could be blended for resale. When Mr. Blessey first contacted Ms. Bogan directly, the purchase price for the products already had been established by Mr. Blessey and Mr. Luca. Ms. Bogan represented in oral and written communications with Mr. Blessey that the material in tank 12 was crude slop oil, consisting of crude oil, water and naptha, would contain no more than 19.6% B S & W (water and sediment), was blendable, and that tank 12 had been "dead" (that is, inactive) for two months and sealed by an independent inspector, E.W. Saybolt & Company, Inc. ("Saybolt").

Commencing March 13, 1986 through March 20, 1986, a series of telexes were exchanged and a number of telephone conversations transpired between Ms. Bogan, Mr. Blessey and Mr. Luca, with respect to the sale of approximately 15,000 barrels of material described as crude slop oil in Falcon tank 12, and 2,500 barrels of residual or No. 6 fuel oil in Falcon tank 26 at $2.75 per barrel. On March 21, 1986, L & L prepaid $38,935.00 for the purchase of the crude slop oil and the residual fuel oil, upon Tenneco's demand. No single written document exchanged between the parties was intended as a final and complete expression of their agreement. Rather, the series of telexes and telephone conversations in March of 1986, comprised the purchase agreement between L & L and Tenneco. L & L had arranged for the resale of the crude slop oil to Cahill Oil and Trading Company, Inc. ("Cahill"), at a profit of $19,768.69.

*The Crude Slop Oil Claim:*

At no time did Ms. Bogan, Mr. Luca, or any other Tenneco employee, warn L & L that a substantial volume of material from tanks 20 and 24 had been transferred into tank 12 during the period March 4 through March 7, 1986. Rather, Ms. Bogan misrepresented that the tank had been dead two months and had been sealed. Nor was Mr. Blessey informed of Tenneco's problems with the material, although Tenneco had ample indication of its "contaminated" nature.

Tenneco made arrangements for L & L to have the materials in tanks 12 and 26 sampled and tested by Saybolt. Saybolt ran several standard tests recognized in the petroleum industry for determining the quality and marketability of crude slop oil and residual fuel oil. L & L was advised that a small amount of styrene was present in the material contained in tank 12; however, the amount was determined to be insignificant such that the product was marketable in accordance with industry standards. Most importantly, Mr. Blessey was never advised that the sample Saybolt tested for L & L had been pulled from tank 12 on March 6, 1986 for another prospective buyer, before the transfer of the material from tanks 20 and 24 into tank 12 had been completed.

On March 26, 1986, Tenneco attempted to deliver the 15,000 barrels of crude slop oil to L & L. As the product was being removed from tank 12 to plaintiff's barge, Falcon's pumps failed due to an excessive amount of solids present in the material. Saybolt gauged the delivery of approximately 10,462.84 actual barrels of 8,412.2 net barrels of material from tank 12, or two-thirds of the volume of crude slop oil sold to L & L. This material was then deposited into tank 80–11 at Houston Fuel Oil Terminal Company's facility in Houston, Texas, on March 27, 1986.

Several days after the tank 12 material was deposited at Houston Fuel Oil Terminal Company's facility, L & L received Saybolt's analysis of the material loaded into the barge. This was the first time L & L learned that the substance delivered by

Tenneco substantially differed from the representations and warranties made by Tenneco. L & L performed additional inspections of the material and thereafter rejected the substance. L & L notified Cahill Oil that it would be unable to deliver the product as had been agreed upon.

Shortly after delivery, L & L was advised by an independent laboratory, Southern Petroleum Laboratories, that the substance delivered by Tenneco to plaintiff from tank 12 could be considered "hazardous waste". Despite several efforts to sell the material to licensed reclaimers dealing in such substances, L & L incurred substantial storage and cleaning charges.

*The Residual Fuel Oil Claim:*

The contract between the parties provided for delivery "F.O.B.", which in industry parlance means "free on board". Thus, Tenneco was responsible for effecting delivery of the products to L & L. Tenneco arranged for the crude slop oil to be delivered to plaintiff's barge, as per the contract. However, after Tenneco had received L & L's prepayment, Tenneco informed L & L that L & L would have to use vacuum trucks in order to effect delivery of the residual fuel oil. The use of vacuum trucks, which are prohibitively expensive, had never been discussed by L & L and Tenneco during their prior negotiations.

On several occasions, L & L sent oil tank trucks to the Falcon Refinery for the purpose of receiving delivery of the residual fuel oil. One truckload or approximately 139 barrels were delivered to plaintiff. Thereafter, Falcon refused to allow further loading of the residual fuel oil as a result of a dispute with Tenneco. Tenneco suggests that plaintiff's failure to provide vacuum trucks prevented Falcon from delivering the remainder of the product. The testimony elicited at trial reveals that Falcon prevented further delivery of the product as a result of a dispute with Tenneco arising from damage caused by the allegedly contaminated feedstock.

L & L transferred the small amount of residual fuel oil it had received to a tank at Houston Fuel Oil Terminal Company's facility in Houston, Texas for storage. Since the balance of the product was never delivered by Tenneco in accordance with the purchase agreement, L & L was unable to extract the 139 barrels from the tank at Houston Fuel Oil Terminal Company's facility, for it fell below the pump line.

On several occasions, L & L made demand for delivery of the residual fuel oil in an effort to mitigate its loss, but Tenneco did not deliver the remainder of the product. Tenneco's only offer to return the money L & L had prepaid for the residual fuel oil was conditioned upon L & L relinquishing all rights against Tenneco with respect to the entire transaction. Finally, Tenneco delivered the residual fuel oil, which belonged to L & L, to a third party, Manville Energy Corporation, without notice to L & L.

## CONCLUSIONS OF LAW

*Crude Slop Oil Claim:*

█ The parties agree that the law of Texas is applicable. This Court finds that the series of telexes and telephone conversations between Mr. Blessey, Ms. Bogan and Mr. Luca, during the period of March 13 through March 20 of 1986, constituted the purchase agreement between L & L and Tenneco, as was their intention. Texas Business and Commerce Code ("Texas Code") §§ 2.204, 1.201(3) and 1.201(11). Specifically, Tenneco agreed to deliver "F.O.B." approximately 15,000 barrels of crude slop oil and 2,500 barrels of residual or No. 6 fuel oil to L & L at $2.75 per barrel, to be prepaid by L & L. Tenneco impliedly warranted that the crude slop oil was merchantable and would be accepted in the petroleum trade. Texas Code § 2.313(a)(1), (2) and (3), 2.314(b)(1) and (b)(3). Tenneco made the following express warranties upon which L & L relied to its detriment:

1) the crude slop oil consisted of normal crude oil, water, and naptha;

2) the crude slop oil had been tested and was determined to have commercial value;

3) the crude slop oil could be blended with No. 6 fuel oil;

4) the crude slop oil contained no more than 19.6% B S & W;

5) tank 12 had been inactive and sealed for over two months at the time of the purchase agreement.

*See*, Texas Code § 2.313(a)(1), (2) and (3), and Comments 3, 5 and 6; *Valley Datsun v. Martinez*, 578 S.W.2d 485, 490 (Tex.Civ. App.1979).

 Additionally, the contract provided for the sale of the crude slop oil "as is" and "without guarantees". Tenneco instructed L & L to test the product to its own satisfaction. These attempted disclaimers are inconsistent with the express warranties and therefore are without legal effect. *Mobil Housing, Inc. v. Stone*, 490 S.W.2d 611, 615 (Tex.Civ.App.1973); *Bowen v. Young*, 507 S.W.2d 600, 605 (Tex.Civ. App.1974). These provisions did not operate to nullify the previous warranties and representations made by Tenneco, but added a requirement that L & L confirm Tenneco's claims. Plaintiff made a good faith effort to test the product, but Tenneco's misrepresentations prevented any accurate results. The sample tested by Saybolt for L & L had been drawn from tank 12 prior to the completed consolidation of the material from tanks 12, 20 and 24 into tank 12. Had Tenneco correctly informed L & L that tank 12 had not been sealed for two months, L & L would have known that the sample drawn by Saybolt did not accurately reflect the nature of the product as a whole. Tenneco induced L & L to purchase the product on the basis of false material assurances, and then attempted to avoid responsibility by adding a "no guarantee" disclaimer to the transaction. After receiving the test results, L & L was happy to purchase the crude slop oil "as is", that is, as it was prior to the consolidation of the material in tanks 12, 20 and 24. Because Tenneco was the engineer of L & L's failure to recognize the true nature of the product, Tenneco must be held accountable for L & L's ensuing losses.

 Tenneco is liable to L & L for breach of contract for the sale of the crude slop oil, because the substance delivered to L & L did not conform in volume or composition to the express warranties made by Tenneco. Texas Code § 2.601. For this reason, L & L was within its rights when it rejected the substance after learning of its true nature. Texas Code § 2.601. Because the substance was not in fact merchantable in accordance with Tenneco's assurances, Tenneco is liable for breach of the implied warranty of merchantability. Tenneco negligently misrepresented the nature of the substance in tank 12 in order to induce L & L to enter into the transaction. Tenneco is liable for damages arising from L & L's reliance upon those misrepresentations.

 However, imprudent, negligent, and misleading, Tenneco's actions were neither grossly negligent nor intentional. An award of punitive damages under Texas law would not be indicated. It is hoped that Tenneco will strive to make accurate representations in its future transactions, without necessitating the imposition of a punitive damage award by this or any other court.

*Residual Fuel Oil Claim:*

 Tenneco and L & L had agreed that delivery of the oil products would be F.O.B. at the Falcon Refinery. Tenneco was obligated to bear the risk and expense of placing the fuel oil into trucks furnished by L & L. Texas Code § 2.319(a)(1); *Nichols v. William A. Taylor, Inc.*, 662 S.W.2d 396, 400 (Tex.Civ.App.1983). Tenneco's demand that L & L take delivery of the residual fuel oil by vacuum trucks constituted a modification of the parties' agreement which failed for lack of consent. Texas Code § 2.301; *Ho v. Wolfe*, 688 S.W.2d 693 (Tex.Civ.App.1985). Tenneco is liable to L & L for breach of contract for the sale of the residual fuel oil, because Tenneco failed to deliver the oil in accordance with the parties' agreement. Texas Code § 2.301.

 L & L had paid for the residual fuel oil, and therefore, had a legal right or title to it. *R. W. Norris v. Bovina Feeders, Inc.*, 492 F.2d 502, 505 (5th Cir.1974); *American*

*Petrofina, Inc. v. PPG Industries, Inc.,* 679 S.W.2d 740 (Tex.Civ.App.1984). Tenneco not only intentionally converted L & L's prepayment by refusing to return it without condition, but also intentionally converted the residual fuel oil by delivering it to a third party without notice to L & L. *Courtesy Pontiac v. Ragsdale,* 532 S.W.2d 118 (Tex.Civ.App.1975); *Masso v. Bryan,* 498 S.W.2d 19 (Tex.Civ.App.1973).

■ Although Tenneco's actions were intentional and in derogation of L & L's rights, they were not so egregious as to warrant an award of punitive damages. Tenneco did not convert L & L's property "maliciously" or "wantonly" as contemplated by Texas law. *Id.* This Court reiterates its sincere wish that Tenneco refrain from such tactics in future transactions. A judgment for compensatory damages should be a sufficient deterrent.

*Conclusion*

Civil Action No. 87–5833 has been consolidated with the present action, for it involves the identical parties and issues. By stipulation of the parties, Record Document #152, this Court shall decide Civil Action No. 87–5833 styled, *Houston Fuel Oil Company v. Walter E. Blessey, Jr. v. Tenneco Oil Company,* on the basis of the testimony presented in Civil Action No. 86–2084 styled, *L & L Trading Company, Inc. v. Tenneco Oil Company.* Accordingly, this Court finds in favor of third-party plaintiff, L & L Trading Company, Inc. and against third-party defendant, Tenneco Oil Company, in the consolidated matter for the foregoing reasons.

In summary, plaintiff has prevailed on its claims for:

1) breach of contract for the sale of crude slop oil;
2) breach of contract for the sale of residual fuel oil;
3) breach of implied warranty of merchantability;
4) breach of express warranties;
5) negligent misrepresentation, and;
6) intentional conversion.

For the foregoing reasons, plaintiff is entitled to damages for these claims upon which plaintiff has prevailed. A hearing will be held to determine the amount of damages to which L & L is entitled in accordance with this Court's Findings and Conclusions.