HUSKY SPRAY SERVICE, INC., and
Dayle Luedeke, Plaintiffs and
Appellees,

v.

Robert PATZER, Monroe Chase, Lawrence F. Schmit, and Midwest Air Center, Inc., Defendants and Appellants.

Nos. 17222, 17243.

Supreme Court of South Dakota.

Argued March 19, 1991.

Decided May 22, 1991.

James A. Wyly of Richardson, Groseclose, Kornmann & Wyly, Aberdeen, for plaintiffs and appellees.

John E. Mack, New London, Minn., and Lonald L. Gellhaus, Williams & Gellhaus, Aberdeen, for defendants and appellants.

AMUNDSON, Justice.

Robert Patzer, Monroe Chase, Midwest Air Center, Inc., and Lawrence F. Schmit (collectively referred to as defendants) appeal from a decision of the trial court awarding damages for breach of express warranty and prejudgment interest to Husky Spray Service, Inc. and its owner Dayle Luedeke (collectively referred to as Luedeke). Luedeke has filed a notice of review, challenging the trial court's rejection of his claim based on breach of implied warranty. We affirm in part, reverse in part and remand.

## FACTS

This case involves a dispute over a 1966 Callair airplane purchased by Luedeke. The airplane is a spray plane that was purchased in 1982 by Robert Patzer (Patzer), who was in the aerial spraying busi-

ness in Minnesota. Although Patzer did not use the plane very much, it received routine annual inspections. These inspections did not cover the plane's spraying system or its crankshaft.

In the spring of 1987, Patzer decided to retire from the aerial spraying business. He contacted Monroe Chase (Chase), president and general manager of Midwest Air Center, Inc. (MAC) in Mandan, North Dakota, to handle the sale of his four airplanes. MAC is an airplane brokerage corporation, selling used aircraft on consignment. When Patzer delivered the plane to MAC on May 10, 1987, he told Chase that it was "ready to go" but that he had not sprayed with it for several years. While at MAC, the plane was given its annual inspection by Lawrence F. Schmit (Schmit), an FAA approved mechanic. Schmit's inspection revealed no problems. In his opinion, the engine had no unusual vibrations.

Luedeke, owns Husky Spray Service of Stratford, South Dakota. In the past, Luedeke had bought and sold planes through MAC, and in May 1987, he called to inquire whether Chase had a plane suitable for his aerial spraying needs. Chase responded that he had Patzer's Callair spray plane for sale and, Luedeke claimed, Chase told him the plane was "ready to go." Chase, however, testified that in past dealings with Luedeke there had been no warranties and that when Luedeke asked about warranties on the Callair, Chase told him there were none with a used plane.

A few days later, Luedeke sent pilots Nick Yockim and Allen January to Mandan to inspect the plane.[1] January testified that after the pilots visually inspected the plane, Chase told him that the "plane was ready to go to work. You can get in it and go to work. If anything is wrong, we will fix it." Yockim testified that Chase promised "if this quits, I will make it right." The pilots passed along these statements to Luedeke when they returned to Stratford.

Chase denied making these statements to the pilots. He stated that the pilots spent several hours inspecting the plane and its logs, and he asked them to take the plane for a test flight three times. He claims to have said "Take a test ride and if you find anything wrong when you get back, we will fix it right here," but the pilots declined because they were satisfied with the plane based on their visual inspection and review of the plane's logs. Chase also testified that he told the pilots that, as far as he knew, the plane was ready to go, "except for the sprayers."

A few days later, Luedeke telephoned Chase to buy Patzer's Callair plane. The parties agreed that Luedeke would pay MAC $6,000 cash and trade in his Cessna worth $10,000 to $12,000, and that the plane would be delivered to Luedeke at Stratford, South Dakota. In late May, 1987, MAC pilot Alan Peiler flew the Callair plane to Stratford and flew the trade-in Cessna back to Mandan. Peiler reported that the plane flew normally except for a minor oil leak due to a loose spark plug, and he testified that Yockim test flew the plane and had no complaints. When Luedeke arrived and visually inspected the plane, bad weather began to set in and Peiler was in a hurry to fly the trade-in back to Mandan. Luedeke testified that to accommodate Peiler, he signed the front of the purchase order (contract) without reading the back of the document and, in fact, the place for his signature on the back of the contract is blank. On the front of the contract, just above the place for Luedeke's signature, MAC had typed in "All times and equipment are represented to the best of our knowledge but final determination is the responsibility of the buyer." The reverse side contained an exclusion of warranties provision and a choice of law provision stating that the contract was to be governed by North Dakota law.

From the start, Luedeke experienced problems with the plane. Most seriously, the air baffles broke off or cracked in flight and the magnetos did not work. The pilots also reported what they felt to be excessive vibration. The emergency brake and pressure light did not work, oil leaked through a loose plug, and the safety pins

---

**1.** Luedeke cannot fly airplanes himself because of his health.

were missing. The spray system had plugged nozzles, a defective pump, and rotted hoses. Luedeke called Chase and Patzer to complain about the condition of the plane. Patzer agreed to send mechanic Schmit to Stratford to look at the plane at Patzer's own expense. Schmit fixed the magnetos when he came to Stratford.

Luedeke thereafter attempted to service his regular customers with this spray plane. However, problems continued to cause the plane to be non-operational for spraying purposes and the pilots attributed this to excessive vibration. Thus, Luedeke experienced substantial down time with the plane. He testified that as a result, he lost spraying jobs of 2,000–3,000 acres at Leola, South Dakota, 3,000 acres at Valley City, North Dakota, and 4,000–5,000 acres in Montana, because the landowners needed the spraying done immediately and could not wait for Luedeke to make repairs on his plane.

On July 25, 1987, pilot January was flying the plane at about 500–800 feet, running at 2000 RPM with a manifold pressure of 26 inches. Suddenly there was a total and immediate loss of power. The crankshaft in the plane's engine had broken in two pieces, causing part of it and the plane's propeller to fall off. January was able to make an emergency landing, preventing further damage to the plane. However, the engine was a total loss. Luedeke lost the use of the plane for the remainder of the spray season.

Prior to trial, defendants brought a motion to dismiss based on lack of jurisdiction, and to determine which state's substantive law applied to the case. The trial court held that it had jurisdiction. Also, the trial court concluded that North Dakota law would be applied to the contract claims, but South Dakota law would be applied to the tort claims. The matter was then set on for a court trial.

At trial, Gordon Person, an FAA certified mechanic, inspector, and test examiner who had conducted accident investigations for the FAA, identified the cause of the Jacobs engine's failure in the spray plane as a fracture in the crankshaft. He testified that the fracture had been slowly increasing in size for an undetermined period of time, and could have started prior to the plane's last one hundred hours of use. Possible causes of the fracture, according to Person, were improper manufacture (which he stated was not indicated in this case), metal fatigue, and improper operation. He also stated that major overhauls on Jacobs engines should be conducted every 550–600 hours of use, and more frequently if the plane had a turbo charger, as the Callair did. At the time of the failure, the engine had 400–429 hours on it.

As to the possibility of improper operation, the Jacobs engine manual recommended maximum manifold pressure of no more than 22.5 inches. January testified that he was operating at 26 inches of manifold pressure at the time of the failure. Person opined that because of the excessive manifold pressure, the pilot was operating at too many RPMs, and that this could overload the bearings and cause premature wear on the engine. The trial court found that the evidence did not establish that the engine failure was due to any defect in the engine which existed prior to the sale.

The court ruled in favor of Luedeke on the theory of express warranty, awarding him $4,300 for his lost profits on the Leola job, plus prejudgment interest from June 1, 1987. The court ruled in favor of defendants on the implied warranty theory, and the tort claims.[2] Defendants appealed, and Luedeke filed a notice of review.

## ISSUES [3]

1. Does the language of the contract preclude recovery on a breach of express warranty theory?

---

**2.** The trial court specifically concluded that no claim was established against Schmit. Luedeke's notice of review challenged this ruling, but that issue has been expressly abandoned by Luedeke in his brief.

**3.** During oral argument, defendants conceded their first issue which challenged the long-arm jurisdiction of South Dakota courts. Thus, we do not address that issue here.

2. Was prejudgment interest authorized?

3. Was there sufficient evidence to support the trial court's findings?

4. Was there sufficient evidence to "pierce the corporate veil" and hold the president of Midwest Air Center liable for the acts of Midwest Air Center?

5. Did the trial court err in not awarding damages based on an implied warranty theory?

## ANALYSIS

*1. Warranty.*

Defendants assign as error the trial court's refusal to give effect to the exclusion of warranties provision of the contract,[4] and awarding damages based on an implied warranty of merchantability and express warranty theory. The trial court applied North Dakota law to the breach of warranty claims, in accordance with the choice of law provision in the contract.[5] The court held the exclusion of warranties clause ineffective because it was never explicitly bargained for and did not set forth with particularity the specific qualities and characteristics which were being disclaimed.

■ To recover damages for breach of warranty, North Dakota's Uniform Commercial Code requires that a party establish "the existence of a warranty, a breach of warranty, and that the breach of warranty proximately caused the damages alleged." *Hagert v. Hatton Commodities, Inc.*, 384 N.W.2d 654, 657 (N.D.1986) (citing *Northwestern Equip., Inc. v. Cudmore,*

312 N.W.2d 347 (N.D.1981) and NDCC § 41–02–31). Whether an express warranty has been given is a question of fact. *Scientific Application, Inc. v. Delkamp,* 303 N.W.2d 71, 74 (N.D.1981). The trial court found the testimony of January and Yockim to be particularly credible because the two pilots no longer worked for Luedeke at the time of trial and thus had no financial incentive to fabricate the statements of Chase regarding the plane, such as the plane is "ready to go," "You can get in it and go to work. If anything is wrong we will fix it," and "if it quits, I will make it right." The court also reasoned that, if the two pilots or Luedeke "were going to make up a scenario of verbal express warranties, they could have done a much more eloquent job of it as to what was promised." Although Chase disputed these statements, there is adequate evidence in the record to support the court's finding that there was an express warranty, and we will not disturb this finding. The trial court had the opportunity to listen to and view the credibility of the witnesses and we will not overturn such a determination. SDCL 15–6–52(a); *Vreugdenhil v. First Bank,* 467 N.W.2d 756, 760 (S.D.1991).

■ The trial court also found that the airplane was not ready to begin spraying as warranted and that this breach of warranty caused "downtime" directly preventing Luedeke from spraying 2,000 acres of land near Leola, South Dakota. Damages were calculated to total $4,300 for the profits lost on the Leola spraying. These findings are also supported by the record and will not be reversed. By establishing these facts, Luedeke proved by a preponderance

---

4. The provision at issue states:

7. EXCLUSION OF WARRANTIES: Buyer agrees to purchase the aircraft in its present condition, *AS IS.* Buyer, by and upon taking physical possession of the aircraft, acknowledges that he has inspected and examined the same to his satisfaction, and accepts it in its then existing condition, as is. There are no warranties from Seller to Buyer which extend beyond the description of the aircraft contained on the face hereof. SELLER MAKES NO OTHER WARRANTIES, IMPLIED OR EXPRESSED. IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS ARE EXCLUDED FROM

THIS AGREEMENT AND DISCLAIMED BY SELLER. (Emphasis in original.)

5. Defendants note that the choice of law provision was on the reverse side of the contract, as was the exclusion of warranties clause. They point out as inconsistent the trial court's decision to give effect to the choice of law clause, while at the same time refusing to enforce the warranty *exclusion because Luedeke did not* sign the reverse. This observation did not rise to the level of a substantive challenge in defendants' brief and thus, we do not express an opinion on the matter.

of the evidence an entitlement to damages for defendants' breach of the express warranty.

Defendants argue that notwithstanding these facts, the exclusion of warranties provision in the contract bars recovery based on any warranty theory. They rely chiefly on the case of *Knecht v. Universal Motor Co.*, 113 N.W.2d 688, 693–94 (N.D.1962). *Knecht* held that, under the Uniform Sales Act, parties to a sales contract may disclaim implied warranties of fitness by express agreement, and that to do so does not violate public policy. In the years since the *Knecht* decision in 1962, however, North Dakota has adopted the Uniform Commercial Code (UCC), and the statutes governing the *Knecht* decision are no longer in effect. *Haugen v. Ford Motor Co.*, 219 N.W.2d 462, 466 (N.D.1974).

■ Warranties of merchantability and fitness for a particular purpose are implied by the North Dakota UCC. NDCC 41–02–31 (UCC § 2–314), 41–02–32 (UCC § 2–315); *Delkamp*, 303 N.W.2d at 74. These warranties may, in fact, be excluded. NDCC 41–02–33 (UCC § 2–316). For any such exclusion to be effective, however, it must be established that the exclusion of warranties was part of the basis of the bargain. *Fleck v. Jacques Seed Co.*, 445 N.W.2d 649, 653–54 (N.D.1989); *Delkamp*, 303 N.W.2d at 74. The exclusion must be "explicitly negotiated between buyer and seller and set forth with particularity showing the particular qualities and characteristics of fitness which are being waived." *Delkamp*, at 74–75 (citation omitted).

■ The logic of the rule requiring that disclaimers be explicitly negotiated demonstrates its necessity.[6]

Both historically and under the Code, the time for determining the terms of the contract is when the bargain is struck. Disclaimers of warranty are no different. Therefore, unless the disclaimers are disclosed prior to the agreement and agreed upon, thereby made part of the contract, they are not binding. *Van Den Broeke v. Bellanca Aircraft Corp.*, 576 F.2d 582, 584 (5th Cir.1978); *Rehurek v. Chrysler Credit Corp.*, 262 So.2d 452, 455 (D.C.App.Fla.1972); *Midland Supply Co. v. Ehret Plumbing & Heating Co.*, 108 Ill.App.3d 1120, 64 Ill. Dec. 601, 440 N.E.2d 153 (1982). Where the seller makes assurances that constitute a promise which is an intended element of the agreement, the express warranty forms the basis of the bargain. *Carpetland U.S.A. v. Payne*, 536 N.E.2d 306, 308 (Ind. Ct.App.1989). If a seller can then defend by asserting the warranty was disclaimed, and thus deprive buyer of the very basis for the bargain, there would be no order or predictability in commercial transactions.

■ Section 2–316 of the UCC (NDCC 41–02–33)[7] protects buyers from disclaimers inserted into written contracts or similar forms which are inconsistent with express warranties. *Id.* at 309; *Earl Brace & Sons v. Ciba–Geigy Corp.*, 708 F.Supp. 708, 710 (W.D.Pa.1989). Thus, where an express warranty and a disclaimer of the express warranty exist in the same sale, there is an irreconcilable conflict and the disclaimer is ineffective. *Carpetland U.S.A.*, 536 N.E.2d at 309; *L & L Trading Co. v. Tenneco Oil Co.*, 693 F.Supp. 470, 475 (E.D.La.1988); *Hemmert Agricultural Aviation, Inc. v. Mid–Continent Aircraft Corp.*, 663 F.Supp. 1546, 1553 (D.Kan. 1987).

---

6. The North Dakota Supreme Court has not discussed the theoretical bases supporting this rule. However, we find the decisions of other courts which have adopted the UCC rule requiring that disclaimers be part of the bargained for exchange to be persuasive and consonant with the decisions of the North Dakota Supreme Court.

7. NDCC 41–02–33 states, in part:
   **41–02–33 (2–316) Exclusion or modification of warranties.**

1. Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this chapter on parol or extrinsic evidence (section 41–02–09) *negation or limitation is inoperative to the extent that such construction is unreasonable.*
(Emphasis added.)

Further, the fact that the written agreement contains a disclaimer of warranties does not preclude evidence of an oral warranty. Where the express representations made by seller are claimed to be inconsistent with the form language of the contract, parol evidence may be admitted to determine whether the written contract is a final expression of the parties' agreement and whether the warranty, or disclaimer thereof, was part of the bargain explicitly negotiated between the parties. *See* NDCC 41–02–09 (UCC § 2–202); *O'Neil v. International Harvester Co.*, 575 P.2d 862, 865 (Colo.App.1978); *Kearney & Trecker Corp. v. Master Engraving Co.*, 211 N.J.Super. 376, 511 A.2d 1227, 1229 (1986) *rev'd on other grounds*, 107 N.J. 584, 527 A.2d 429 (1987); *Drier v. Perfection, Inc.*, 259 N.W.2d 496, 502 (S.D.1977). Under North Dakota law, the essential inquiry, *i.e.* whether the disclaimer was explicitly negotiated between the parties, requires that extrinsic evidence be admitted to determine the validity of an attempted disclaimer of warranties under NDCC 41–02–33 (UCC § 2–316). *Fleck*, 445 N.W.2d at 654; *Delkamp*, 303 N.W.2d at 74.

In this case, the trial court found that the exclusion of express warranties was never explicitly bargained for and the language used in the contract failed to state with particularity the specific qualities and characteristics of the spray plane's fitness that were being disclaimed. In fact, the trial court found that Luedeke's claim that he had not read the reverse side of the contract and was unaware of the exclusion of warranties clause was supported by the fact that the place for his signature on the reverse side was blank. Defendants failed to establish that the complete exclusion of all warranties was explicitly negotiated with Luedeke, and thus, the trial court properly held the attempted limitation ineffective under North Dakota law.

Defendants further argue that Luedeke's signature on the front of the contract is sufficient to establish the validity of the exclusion because the following was printed above the signature line:

I, the undersigned Buyer, state that I have fully read, understand and agree to be bound by the terms and conditions contained on BOTH SIDES of the Purchase Order. I agree that this Purchase Order, when accepted by an authorized representative of Seller, shall be a binding contract for the purchase and sale of the above described aircraft, subject to those terms and conditions.

Defendants contend that, although Luedeke did not read the reverse side of the contract, he did so at his own risk. They claim that "failure to read a document before signing does not excuse ignorance of its contents," and that "where mutual assent of the parties is evidenced from the writing, the contract will be binding regardless of the subjective misunderstanding of a party."

As support for this contention, defendants cite *Hunter v. Texas Instruments, Inc.*, 798 F.2d 299 (8th Cir.1986), which rejected a claim for breach of express and implied warranties. While *Hunter* did note that a reasonable person would read all the contract provisions he or she signs, there the buyer had admitted that he read the disclaimer and understood it. That is distinguishable from this case, however, because the North Dakota test regarding disclaimers focuses on whether the provision was negotiated, not read. In addition, the *Hunter* decision was based on the holding that a manufacturer's disclaimer or limit of remedy in a dealer's contract was not ineffective solely because the manufacturer was not a party to the contract, and that a disclaimer of warranty in a preprinted form contract is not *per se* unconscionable. 798 F.2d 299. These theories are not at issue here and thus, *Hunter* is inapplicable to this case. Accordingly, the trial court's award of damages for breach of express warranty is affirmed.

*2. Prejudgment Interest.*

Defendants contend that Luedeke was not entitled to prejudgment interest because his testimony that the lost Leola spraying jobs involved 2,000 to 3,000 acres is too uncertain to support an award of prejudgment interest. Prejudgment inter-

est is authorized in North Dakota by NDCC 32–03–04, which states:

> Every person who is entitled to recover damages certain or capable of being made certain by calculation, the right to recover which is vested in him upon a particular day, also is entitled to recover interest thereon from that day, except for such time as the debtor is prevented by law or by the act of the creditor from paying the debt.

The amount of damages does not require proof to a degree of mathematical precision, and difficulty in computing the damages does not defeat one's right to prejudgment interest if it is susceptible of being made certain by mathematical calculation from known factors. *Super Hooper, Inc. v. Dietrich & Sons, Inc.*, 347 N.W.2d 152, 156 (N.D.1984); *Robertson Co. v. Kenner*, 311 N.W.2d 194, 200 (N.D.1981).

For example, in *Kenner*, the North Dakota Supreme Court affirmed an award of prejudgment interest where the lost profits were not precise, but were capable of calculation. 311 N.W.2d at 200. In that case, "Kenner sustained lost profits on *more than 500,000 pounds* of sunflowers at *two to three cents ($.02 to $.03) per pound.*" *Id.* (Emphasis added.)

▇▇ Here, Luedeke testified that the lost spraying jobs at Leola involved 2,000 to 3,000 acres, and pilot January estimated the figure to be 2,800 to 3,000 acres. Luedeke also testified that he charged $3.25 per acre for this spraying, and that his expenses included a pilot fee of $0.60 per acre, fuel cost of $0.40 per acre, and maintenance expense of $0.10 per acre. The trial court computed the damages as follows:

| | |
|---|---|
| 2,000 acres at Leola @ 3.25 per acre | $ 6,500 |
| Less pilot fee of .60 per acre | − 1,200 |
| Less fuel cost of .40 per acre | − 800 |
| Less maintenance of .10 per acre | − 200 |
| | |
| TOTAL DAMAGES | $ 4,300 |

The trial court clearly found that the lost spraying acreage was the lower estimate made by Luedeke, *i.e.* 2,000 acres. The facts here are unlike those in *Super Hooper*, where the North Dakota Supreme Court held that the trial court correctly rejected a demand for prejudgment interest. 347 N.W.2d at 156. In *Super Hooper*, the contract giving rise to damages was ambiguous as to defendants' obligation to test market the product, the applicable discount percentage, and the time for payment, among other things. *Id.* Although the *Super Hooper* claim was uncertain as to both time and quantity, here all factors are "susceptible of being made certain by mathematical calculations from known factors." *Id.* See *Metcalf v. Security Int'l Ins. Co.*, 261 N.W.2d 795, 802–03 (N.D.1978). The lost acreage was easily ascertained by the trial court and was not uncertain. Accordingly, the trial court properly awarded prejudgment interest.

### 3. Sufficiency of the Evidence.

As their fourth issue, defendants contend that the court's findings regarding the existence of a warranty and damages were insufficiently supported by the evidence. As to the sufficiency of the evidence on damages, defendants simply reallege their contention from the previous issue, arguing that Luedeke had no idea how many acres would have been sprayed near Leola, and uncertainty regarding fuel and maintenance expenses. The evidence supporting the trial court's findings has been outlined above, and is adequate to support the court's findings. See *Nicolaus v. Deming*, 81 S.D. 626, 139 N.W.2d 875 (1966).

▇▇ In regard to defendants' challenge of the evidence of the warranty, what they actually argue is that, even given the existence of an express warranty, recovery is barred because Luedeke did not provide notice to defendants of the breach and an opportunity to cure, and because Luedeke did not attempt to "cover" by obtaining a substitute plane to complete the Leola spraying. See NDCC 41–02–70. Luedeke contends that these issues were not presented to the trial court and, because they are now being raised for the first time, they are not properly before us on appeal.

The settled rule is as follows:

> An issue may not be presented for a first time on appeal. The appellant must af-

firmatively establish a record on appeal that shows the existence of error. He [or she] must show that the trial court was given an opportunity to correct the grievance he [or she] complains about on appeal.

*Cooper v. Cooper*, 299 N.W.2d 798, 800 (S.D.1980) (citations omitted). "[W]e will not review a matter on appeal unless proper objection was made before the trial court. Objections must be made to the trial court to allow it to correct its mistakes." *Johnson v. John Deere Co.*, 306 N.W.2d 231, 239 (S.D.1981) (citations omitted). "Since our function is that of review, issues not presented to the trial court are not before us on appeal." *Chipperfield v. Woessner*, 84 S.D. 13, 19, 166 N.W.2d 727, 730 (1969).

The matters of notice of breach and cover were not raised in defendants' pleadings. The settled record is devoid of any objection by defendants regarding notice or cover, or a general challenge of the sufficiency of the evidence. The settled record does not contain any proposed findings of fact and conclusions of law by defendants, and they filed no objection to the proposed findings and conclusions submitted by Luedeke. *See* SDCL 15–6–52(a); SDCL 15–26A–8. There is no evidence that the trial court was ever given an opportunity to consider these questions.

Furthermore, defendants did not file a reply brief in this court addressing Luedeke's contention that these issues have been waived. Defendants have failed to preserve these issues, and the issues therefore are not subject to consideration on this appeal. *Johnson*, 306 N.W.2d at 239.

*4. Personal Liability of Chase.*

In a rather summary fashion, defendants assert that corporate officers are immune from individual liability for corporate acts, and that because Chase was acting on behalf of MAC, the trial court could not hold Chase liable in this case. They contend that as president of MAC, Chase's conduct was simply a matter of selling on behalf of MAC and making the arrangements incidental to that sale. Defendants argue that

the only instances in which Chase could be held liable for his acts as a corporate president are circumstances where "the notion of a legal entity is used to justify wrong, protect fraud, or defend crime—the basic 'piercing the corporate veil' doctrine." In response, Luedeke contends that liability was properly imposed on Chase because, in acting as an agent, he is personally liable to a third person for his own negligence or his own misrepresentation.

The trial court stated its basis for holding Chase personally liable in its findings of fact and conclusions of law. The court's second finding states:

2. The plaintiffs purchased from Robert Patzer, Monroe Chase, and Midwest Air Center, Inc., a used Callair spray plane which had been represented to the plaintiffs by Monroe Chase, as an agent of Robert Patzer and as the agent of Midwest Air Center, Inc., as being "ready to go."

The corresponding conclusion is as follows:

1. There were express warranties made by Monroe Chase, personally and as agents (sic) for Robert Patzer and Midwest Air Center, Inc.

The trial court's decision indicates that the liability of Chase was based on an agency theory. However, the court awarded damages based on the breach of warranties arising out of the contract claims.

The liability of an agent to a third party is limited. Generally, an agent can be held liable to a third party only for his or her own separate tortious acts, and that obligation is founded on the common law principle that every person must act in a manner so as not to injure another. 3 Am.Jur.2d *Agency* § 309 (1986); *Harding v. Ohio Casualty Ins. Co.*, 230 Minn. 327, 41 N.W.2d 818 (1950); *Herzog v. Mittleman*, 155 Or. 624, 65 P.2d 384 (1937). An agent cannot, however, be held liable as a contracting party for breach of the contract between the principal and the third party unless the contract itself contains language charging the agent personally. 3 Am.Jur.2d *Agency* § 304. Here, the only liability imposed by the trial court was contractual in nature, and the trial court con-

cluded that "[n]o fraud was established" and denied recovery to Luedeke based on his tort claims.

▮▮▮▮▮ Furthermore, North Dakota law on this point is well settled. A corporation is distinct from its directors and officers, and they are generally not personally liable for their actions when acting for and on behalf of the corporation. *Dangerud v. Dobesh*, 353 N.W.2d 328, 331 n. 2 (N.D.1984); *Hilzendager v. Skwarok*, 335 N.W.2d 768, 774 (N.D.1983); *Danks v. Holland*, 246 N.W.2d 86, 90 (N.D.1976). The corporate entity can be disregarded to impose personal liability on officers and directors only "when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime[.]" *Hilzendager*, 335 N.W.2d at 774 (citation omitted). Here, the trial court made no findings indicating the existence of any of the factors necessary to disregard the corporate entity and hold an officer personally liable. *See Id.* There is no basis in the record for holding Chase personally liable, and the judgment of the trial court against Monroe Chase personally is reversed.

*5. Implied Warranty.*

By notice of review, Luedeke argues that the trial court should have awarded damages on a breach of implied warranty theory for the lost spraying jobs at Valley City, North Dakota, and in Montana.[8] Luedeke has failed to cite any authority for this argument, in violation of SDCL 15–26A–60(6), and therefore this issue is deemed waived. *Neilsen v. McCabe*, 442 N.W.2d 477 (S.D.1989).

The decision of the trial court is affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.

MILLER, C.J., and WUEST and SABERS, JJ., concur.

HENDERSON, J., specially concurs.

HENDERSON, Justice (specially concurring).

WARRANTIES

I concur realizing this Court has affirmed the trial court's application of North Dakota law. It is a given fact that North Dakota decisions and statutes apply.

As to a decision from this Court, in the future, on the law of our state, as governed by South Dakota statutes and previous decisions in this Court, I reserve my judgment for a day when the precise questions arise.

In my opinion, not signing the reverse side of the purchase order can be interpreted that the buyer did not agree to the provisions on the reverse side. The reverse side contained an exclusion of warranties provision.

With respect to *what* was said by *whom* concerning the oral representations, the trial court was faced with a big credibility scenario, and it resolved the conflicts of evidence in favor of the buyer. We are not at liberty to change the findings where the trial court has resolved conflicts in the evidence. *Mulder v. Tague*, 85 S.D. 544, 186 N.W.2d 884 (1971). This Court should not superimpose its judgment on the credibility of the witnesses, as we have so often expressed throughout this Court's history. In approving the trial court's findings, it is important to note that the trial court sifted through voluminous testimony in determining, as a matter of mixed fact and law, that the exclusion of express warranties was never expressly bargained for.

In essence, my point with respect to the warranties, is that we must realize that we have before us, a South Dakota trial judge applying North Dakota law, based upon the facts he finds. South Dakota, in the future, should make its own law. This is not to say that we should disregard, out of hand, the legal work product of our Brothers in North Dakota.

PREJUDGMENT INTEREST

South Dakota's prejudgment interest law has developed uncertainty with the advent of new members serving on this Court. I

8. Defendants have not filed a reply brief to

respond to Luedeke's notice of review issues.

have served with five different Courts from the standpoint of a different composition of the Court. As a result of differing opinions on how to apply this state's statute, great conflict, consternation, and trouble has flowed with the trial bench and bar in trying to apply the prejudgment interest statute to different factual scenarios. However, it is to be noted, again, that the trial judge on the prejudgment interest issue, applied all North Dakota decisions. In essence, North Dakota's law is based upon the theory that prejudgment interest must be susceptible of being made certain by mathematical calculation from known factors. We must apply that rule to the facts at hand. According to the record, I glean as follows: (1) A May 4, 1990 judgment exists; it does not specify the amount of interest; it does specify $4,300.00 principal; and (2) A May 24, 1990 judgment exists; it specifies principal of $4,300.00; but it adds $1,935.00 interest from: June 1, 1987 to June 1, 1990. Therefore, it nicely cleaves it for three years, from June 1, 1987 to June 1, 1990. It expresses that interest will be $5.38 per day. In my opinion, post judgment interest would follow South Dakota law because this is a South Dakota judgment. Patzer, et al., concede that if Husky prevails, that Husky is entitled to post judgment interest. The amount of acreage business lost, according to one witness, because of non-spraying at Léola, was 2,800 to 3,000 acres. Several spraying days were lost due to the fact that only one spray plane was in operation; the other plane was down, namely the plane in question. The down plane was delivered on May 27, 1987. The trial judge chose the date on June 1, 1987 as the time to begin calculating interest. It appears the trial judge took into consideration the number of acres, a spraying fee of $3.25 per acre, deducted the pilot's fee of $.60 per acre, calculated the maintenance, all from the trial transcript. Although there was no mathematical precision, there does appear to be the mathematical calculation, by the trial court, as to a day certain and factors to apply to the non-usage of the airplane in question. There appears to be a fair, non-erroneous finding by the trial court on prejudgment interest. It was a studied effort by the trial court based upon testimony in the record. It was far from a slapdash judgment. Therefore, I would sustain the prejudgment interest based upon the sworn testimony and the reasonable exactness of the prejudgment award. *Super Hooper, Inc. v. Dietrich & Sons, Inc.*, 347 N.W.2d 152 (N.D.1984).

I concur on the dissertation regarding the sufficiency of the evidence, liability of Chase, and implied warranty issues.